IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VINCENT SORACE, JOSEPH YERTY, TAMMY YERTY, JAMES ZARONSKY, LINDA ZARONSKY, VIKTOR STEVENSON, ASHLEY YATES, and KIMBERLY SOLOMON-ROBINSON, individually and on behalf of a class of similarly situated persons,<br><br>Plaintiffs,<br><br>v.<br><br>WELLS FARGO BANK, N.A.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION<br><br>No. 2:20-CV-4318<br><br>Hon. Gerald J. Pappert |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
THEIR UNCONTESTED MOTION FOR FINAL APPROVAL OF SETTLEMENT
AGREEMENT, CERTIFICATION OF SETTLEMENT CLASS, APPROVAL OF
ATTORNEY FEES AND COSTS, ENTRY OF FINAL JUDGMENT, AND
<u>DISMISSAL WITH PREJUDICE</u>**

Richard Shenkan
Shenkan Injury Lawyers, LLC.
6550 Lakeshore St.
West Bloomfield, MI 48323
P: (248) 562-1320
rshenkan@shenkanlaw.com

*Co-Counsel for Plaintiffs*

Hon. Lawrence F. Stengel (Ret.)
Saxton & Stump, P.C.
280 Granite Run Dr., Suite 300
Lancaster, PA 17601
P: (717) 556-1000
lfs@saxtonstump.com

*Co-Counsel for Plaintiffs*

## TABLE OF CONTENTS

I.    OVERVIEW.................................................................................1

II.   BACKGROUND.........................................................................4

      A.  Procedural History............................................................4

      B.  Plaintiffs' Claims and Positions ........................................5

      C.  Wells Fargo's Defenses and Positions................................7

      D.  Class Counsel's Investigation ...........................................7

      E.  Settlement Negotiations....................................................7

III.  SUMMARY OF THE SETTLEMENT TERMS..........................8

      A.  The Class and Class Notice...............................................8

      B.  Monetary Relief..............................................................10

           1.  Settlement Payment..................................................10

           2.  Compromise of Disputed Deficiency Balances through
               an Accord and Satisfaction........................................13

           3.  Expungement or Satisfaction of Deficiency Judgements....................16

      C.  Non-Monetary Relief – Requests for Deletion of Tradelines.......................16

      D.  Releases.......................................................................16

      E.  Settlement Administration...............................................19

IV.   ARGUMENT...........................................................................20

      A.  Final Approval of the Settlement Agreement Should be Granted...................20

           1.  Legal Standard for Final Approval.............................20

           2.  Analysis of the *Girsh* and Rule 23(e)(2) Factors..............................23

                (a)  The Complexity, Expense and Likely Duration of the Litigation...23

                (b)  The Reaction of the Class to the Settlement..........................25

                (c)  The Stage of the Proceedings and Amount of

        Discovery Completed....................................................25

        (d) and (e) The Risks of Establishing Liability and Damages.........26

        (f) The Risk of Maintaining the Class Action through the Trial........27

        (g) The Ability of the Defendant to Withstand a Greater
        Judgment....................................................27

        (h) and (i) The Range of Reasonableness of the Settlement
        Fund in Light of the Best Possible Recovery and All the
        Attendant Risks of Litigation........................................28

    3.   Additional Factors................................................31

  B.  The Settlement Class Should Be Certified...............................34

  C.  Class Counsel's Requested Fees are Reasonable and Should Be Approved
     and Class Counsel's Expenses are Reasonable and Should be Reimbursed........35

    1.   The Equitable Foundation for Award of Attorneys' Fees in
       Representative Actions...........................................35

    2.   The *Gunter* Factors...............................................36

        (a) The size and nature of the common fund created, and the
        number of persons benefited.......................................36

        (b) The absence of objections to the request for fees supports
        Approval....................................................38

        (c) The Skill and Efficiency of Class Counsel...........................38

        (d) The complexity and duration of the litigation.......................41

        (e) The risk of nonpayment...........................................42

        (f) Awards in other class actions......................................43

    3.   Plaintiff's requested fee is an appropriate percentage of the recovery
       and the request for reimbursement of costs is reasonable..................44

V.  CONCLUSION................................................................45

## TABLE OF AUTHORITIES [1]

## Cases

*Amchem Prods., Inc. v. Windsor,*

    521 U.S. 591, 625 (1997)……………………………………………………27, 36

*Anheuser Busch Employees' Credit Union v. Wells,*

    Case No. 1522-AC09263-01 (Mo. Cir. July 10, 2018)………………………………… 31, fn. 10

*Antonik, et al. v. First National Community Bank, et al.,*

    2013-cv-4438 (Lackawanna County 2013) ………………………………………39

*Boeing Co. v. Van Gemert,*

    444 U.S. 472, 478 (1980)……………………………………………………………35

*Ciccarone v. B.J. Marchese, Inc.,*

    2004 WL 2966932 (E.D. Pa., 2004) ………………………………………………30, 43

*Conner v. Carepoint Medical Solutions, LLC.,*

    2:16-cv-01436-NBF (W.D. Pa. 2017)……………………………………………40

*Conner v. Optum360, LLC.,*

    2:17-cv-01642 (E.D. Pa. 2019) …………………………………………………40

*Cooley, et al. v. FNB, et al.,*

    03-CV-10010 (Lawrence County 2003)…………………………………………34

*Cruz, et al., v. Citadel Federal Credit Union,*

    200501167 (Phl. CCP May 2020) ………………………………………………39

*Cullen, et al., v. Whitman Med. Corp.,*

    197 F.R.D. 136, 147 (E.D. Pa. 2000) ……………………………………32, 33, 35, 44

*Dudo, et al., v. Capital One Auto Finance,*

    296-2020 (Jefferson County 2020) …………………………………………30, 39

*Ehrheart v. Verizon Wireless,*

    609 F.3d 590, 592-93 (3d Cir. 2010) ……………………………………………20

*Florin v. Nationsbank of Georgia, N.A.,*

    34 F.3d 560, 565 (7th Cir. 1994) ………………………………………………… 35

*Flynn et al v. M&T Bank,*

    2:17-cv-04806-WB (E.D. Pa. 2022) ……………………………………………39

---

[1] Class Counsel will immediately furnish any order or opinion upon request.

*Follansbee v. Discover Fin. Servs., Inc.,*
  2000 WL 804690, at *2 (N.D. Ill., 2000) ....................................................32, 44

*Gaskill v. Gordon,*
  160 F.3d 361 (7th Cir. 1998) .....................................................................35, 43

*Girsh v. Jepson,*
  521 F.2d 153 (3d Cir. 1975)........................................................................ *passim*

*Grier v. Chase Manhattan Automotive Finance Co.,*
   2000 WL 175126 (E.D. Pa.) ...........................................................................43

*Gunter v. Ridgewood Energy Corp.,*
  223 F.3d 190, 195 (3d Cir. 2000) ..............................................................36, 38

*Hughes v. Nationwide Trust Company, FSB,*
  10557-2020 (Lawrence County CCP 2022) ................................................39, 40

*In re AT & T Corp.,*
  455 F.3d 160, 175 (3d Cir.2006) .....................................................................35

*In re Baby Prod. Antitrust Litig.,*
  708 F.3d 163 (3d Cir. 2013)..............................................21, 22, 23, fn. 9

*In re Cendant Corp. Securities Litigation,*
  109 F.Supp.2d 235 (D.N.J. 2000) ...........................................................21, 32, 35

*In re Comcast Corp. Set-Top Cable Television Box Antitrust Litig.,*
  2019 WL 4645331, 33 F.R.D. (E.D. Pa., 2019)................................. 21, 23 fn. 9

*In re Constar Int'l Inc. Sec. Litig.,*
  585 F.3d 774, 781 (3d Cir. 2009) ....................................................................36

*In re Diet Drugs Prod. Liab. Litig.,*
  553 F. Supp. 2d 442, 473 (E.D. Pa. 2008) ......................................................38

*In re Flonase Antitrust Litig.,*
  291 F.R.D. 93, 104 (E.D. Pa. 2013) ................................................................38

*In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.,*
  55 F.3d 768 (3d Cir. 1995)..................................................................20, 28, 41

*In re Google Inc. Cookie Placement Consumer Privacy Litig.,*
  934 F.3d 316 (3d Cir. 2019)................................................... 21, 23, fn. 9

*In Re Greenwich Pharm. Sec. Lit.,*
    1995 WL 251293 (E.D. Pa. 1995) ...................................................................44

*In re Ikon Office Solutions, Inc., Sec. Litig.,*
    194 F.R.D. 166, 194 (E.D. Pa. 2000) .........................................................38, 41

*In re Lloyd's Am. Trust Fund Litig.,*
    2002 WL 31663577, at *26 (S.D.N.Y., 2002) .........................................32, 44

*In re Nat'l Football League Players Concussion Injury Litig.,*
    821 F.3d 410 (3d Cir. 2016).................................................... 21, 22, 31, fn. 11

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,*
    148 F.3d 283 (3d Cir. 1998)............................................................... *passim*

*In re Rite Aid Corp. Sec. Litig.,*
    396 F.3d 294, 300 (3d Cir. 2005) ..............................................................35, 38

*In re Warfarin Sodium Antitrust Litigation,*
    391 F.3d 516 (3d Cir. 2004)...................................................20, 21, 28 31, fn. 11

*Jackson v. Missouri Credit Union*, Case,
    No. 18BA-CV0665 (Mo. Cir. March 14, 2022) ............................. 31 fn. 10, 43

*Kelly v. Santander Consumer USA, Inc.,*
    2:20-cv-03698-MMB (E.D. Pa. 2020) ……………………………………..39

*King v. Boettcher,*
    616 A.2d 57 (Pa. Commw. Ct. 1992) ..........................................................14

*Langer, et al., v. Capital One Auto Finance,*
    2:16-CV-06130-HB (E.D. Pa. 2019) ...........................................................39

*Maszgay, et al., v. First Commonwealth Bank,*
    15-CV-686 (Jefferson County 2018).........................................................39, 40

*Mauthe v. ITG,*
    5:18-CV-01968 (E.D. Pa. 2021) ...............................................................40

*Mauthe v. Spreemo,*
    18-CV-1902 (E.D. Pa. 2021) ....................................................................40

*Mauthe v. Versa Cardio, LLC,*
    5:16-cv-00570-JLS (E.D. Pa. 2019) ...........................................................40

*Niles v. Metropolitan Casualty Insurance Co. of New York,*

317 Pa. 545, 177 A. 754 (1935) ...............................................................14

*O'Rourke v. Healthdyne, Inc.*
1986 WL 923, at *2 (E.D. Pa. Jan. 16, 1986) ...................................42

*Pennwalt Corp. v. Plough,*
676 F.2d 77, 79-80 (3d Cir. 1982) ...................................................20

*Perod v. McKenzie Check Advance of Pennsylvania, LLC.,*
No. 98-CV-6787 (E.D. Pa. 2000) ................................................32, 39

*Ryan, et. al., v. Tidewater Finance Company,*
170903529 (Phil. CCP. 2017)........................................................39, 40

*Sullivan v. DB Investments, Inc.,*
667 F.3d 273 (3d Cir. 2011)................................................................28

*Taubenfeld v. Aon Corp.,*
415 F.3d 597 (7th Cir. 2005) .............................................................43

*Trustees v. Greenough,*
105 U.S. 527 (1882)............................................................................35

*Universal Credit Acceptance, Inc. v. Myers,*
No. 15JE-AC05976-01 (Mo. Cir. Feb. 8, 2021) ..................... 31 fn. 10

*Ward v. Flagship Credit Acceptance LLC.,*
2020 WL 759389 (E.D. Pa., 2020) ........................... 21, 23, fn. 9

*Zarin v. Commissioner of Internal Revenue,*
916 F.2d 110 (3d Cir. 1990)...............................................................15

## Statutes

1 Pa.C.S. §1932(a) ..................................................................................5

1 Pa.C.S. §1932(b) ..................................................................................5

12 Pa.C.S. §6254.................................................................................5, 6

13 Pa.C.S. §1103(b).................................................................................25

13 Pa.C.S. §9610(b)..................................................................................5

13 Pa.C.S. §9611.......................................................................................5

13 Pa.C.S. §9613.......................................................................................6

13 Pa.C.S. §9614.......................................................................................6

13 Pa.C.S. §9616 ................................................................................................6

13 Pa.C.S. §9625(b)(2) .......................................................................................1

13 Pa.C.S. §9625(a) ...........................................................................................6

13 Pa.C.S. §9625, Official Comment 4 ...............................................................6


**Court Rules**

Fed. R. Civ. P. 23(e) .........................................................................................20

Fed. R. Civ. P. 23(e)(2)..................................................................................21, 24


**Secondary Sources**

Lea Shepard, *Seeking Solutions to Financial History Discrimination,*
     46 Conn. L. Rev. 993 (2014) ......................................................................30

White & Summers, *Uniform Commercial Code* §34-12(b) (5th ed.) ...............................6

Plaintiffs, Vincent Sorace, Joseph Yerty, Tammy Yerty, James Zaronsky, Linda Zaronsky

Viktor Stevenson, Ashley Yates, and Kimberly Solomon-Robinson (together, "Plaintiffs"), by and

through their undersigned counsel, submit this Memorandum of Law in Support of their

Uncontested Motion for Final Approval of Settlement Agreement, Certification of Settlement

Class, Approval of Attorney Fees and Costs, Entry of Final Judgment, and Dismissal with

Prejudice, stating as follows:

## I. OVERVIEW

Plaintiffs, on their own behalf and on behalf of similarly situated consumers, have asserted

claims against Defendant, Wells Fargo Bank, N.A. ("Wells Fargo"), under the Pennsylvania

Uniform Commercial Code, 13 Pa.C.S. §§ 9601, *et. seq.* (the "UCC"), independently, and in *pari*

*materia* with the motor vehicle Sales Finance Act, 12 Pa.C.S. § 6251 *et. seq.* (the "MVSFA").[1]

The claims relate to Wells Fargo's form "Post-Repossession Consumer Disclosure Notices"

("Notices of Repossession") and "Explanations of Calculation of Surplus or Deficiency" ("Post-

Sale Notices") that it sent to Plaintiffs and the putative Class Members after it repossessed their

motor vehicles and other repossession related activities. Plaintiffs, on their own behalf and on

behalf of the putative Class Members, sought statutory damages under 13 Pa.C.S. § 9625(b)(2) for

Wells Fargo's alleged violations of the UCC, independently, and in *pari materia* with the MVSFA.

After more than a year of protracted litigation and almost two years of complicated

settlement negotiations, Plaintiffs and Wells Fargo (together the "Parties") reached an agreement

to settle this case on a class wide basis, providing significant benefit to 22,340 Class Members

(borrowers and co-borrowers) involving 17,235 unique loans (i.e., Accounts). Pursuant to the

---

[1] The MVSFA was originally found in Chapter 7 of Title 69 of Purdon's Statutes. In 2014, it was repealed and recodified in Chapter 62 of Title 12 of Pennsylvania Consolidated Statutes.

1

Settlement Agreement, attached hereto as **Exhibit 1**, Wells Fargo has agreed:

(1) To pay a total of $15 million[2] into a Settlement Fund[3], which will be distributed to the Class Members on a per account basis after payment of Incentive Awards to the class representatives, payment of settlement administration costs, and payment of attorneys' fees and expenses;

(2) To compromise Deficiency Balances in the approximate amount of $66.7 million, with the exception of Class Members whose Account balances arose after a reinstatement – where the borrower paid the amount past due (plus repossession expenses) in order to have their vehicle returned to them;

(3) To refund payments made by Class Members following repossession and sale of their repossessed vehicle ("Refund Payments"), in the approximate amount of $6.87 million which will be made from the $15 million Settlement Fund; and

(4) To request that the Credit Reporting Agencies to which Wells Fargo reports delete the entire credit tradeline associated with all Class Members' Accounts (including all references to the alleged defaulted loan and repossession), to the extent Wells Fargo submitted any tradeline information to them.[4]

On September 15, 2023, this Court granted Plaintiffs' Motion for Preliminary Settlement Approval, Conditional Certification of Settlement Classes, and Approval of Class Notice. ECF 74 and 85. Pursuant to Federal Rule of Civil Procedure 23(e), that Order (the "Preliminary Approval Order"), *inter alia*: (i) preliminarily approved the Parties' proposed settlement in this action (the "Settlement"), as memorialized in the Settlement Agreement; (ii) preliminarily certified the Class for settlement purposes; (iii) preliminarily appointed Plaintiffs as class representatives of the Class; (iv) preliminarily appointed Plaintiffs' undersigned counsel as Class Counsel; (v) set the date for a hearing as to Final Approval of the Settlement, for January 31, 2024, (vi) approved the Class Notice informing Class Members of the Settlement and their rights in connection therewith and

---

[2] The funds have been invested in Treasury Bills which is expected to add an approximately additional $255,000 to the settlement fund. See Declaration of Settlement Administrator, ¶ 22, **Exhibit 2**.

[3] Capitalized terms in this Brief are defined as in the Settlement Agreement, unless otherwise stated.

[4] Class Members could have opted out of this significant credit reparation benefit. No Class Member chose to do so.

the method of dissemination of the Class Notice; (vii) appointed Rust Consulting as the third-party Settlement Administrator; (viii) authorized the establishment of the Qualified Settlement Fund; (ix) set the deadline for Class Members to request exclusion from the Class for 40 days after the mailing date of the Class Notice; (x) Permitted Class Members to opt out of the credit tradeline deletion benefit; (xi) set the deadline for Class Members to object to the Settlement for 40 days after the mailing date of the Class Notice; (xii) stayed this Action pending Final Approval; and (xiii) temporarily barred Class Members who do not timely exclude themselves from the Settlement Class from directly or indirectly maintaining, commencing, prosecuting, or pursuing any Released Claim covered by the Release in the Settlement Agreement.

The Court approved Settlement Administrator established the settlement website and sent the Court approved Class Notice to the 22,340 Class Members on November 14, 2023. The deadline for Class Members to object to the settlement terms or opt-out of the settlement expired on December 26, 2023. Eleven Class Members associated with seven Accounts made valid opt-out requests, and only three Class Members have interposed objections, one of which was withdrawn[5].

Plaintiffs now move the Court, pursuant to Federal Rule of Civil Procedure 23(e), for an order, *inter alia*: (i) granting final approval of the Settlement Agreement; (ii) certifying the Class; (iii) awarding the requested attorney fees and approving the reimbursement of counsel's expenses; (iv) approving the requested service awards to the Representative Plaintiffs; (v) entering final judgment; and (vi) dismissing this case with prejudice.

---

[5] Plaintiffs' response to the remaining Objection (by Class Members Shawn and Jennifer Hummel) is set forth in a contemporaneously filed response.

## II. BACKGROUND

### A. <u>Procedural History</u>

Plaintiffs filed their initial Complaint in the Pennsylvania Court of Common Pleas for Philadelphia County on July 7, 2020 (ECF 1-1), alleging that Wells Fargo violated the UCC, independently, and in *pari materia* with the MVSFA, by failing to comply with the statutory requirements relating to Notices of Repossession and Post-Sale Notices. This Complaint was removed to this Court on September 2, 2020. (ECF 1). Shortly thereafter Wells Fargo sought to have the case dismissed (ECF 5) and Plaintiffs sought to have the case remanded to state court. (ECF 10). The Court denied Plaintiffs' Motion for Remand (21). Plaintiffs filed an Amended Complaint (ECF 24) and Wells Fargo filed a Motion to Dismiss (ECF 27) in March and April of 2021. Plaintiffs filed a Second Amended Complaint (ECF 30, 35, 36), which is the operative complaint, and Wells Fargo filed a Motion to Dismiss (ECF 38) in August and September of 2021. Plaintiffs filed a Response to the Motion to Dismiss and Wells Fargo filed a Reply in October, 2021.

On November 16, 2021, the Parties filed a Joint Motion to Stay Litigation Pending Mediation (ECF 48), which the Court granted on November 23, 2021 (ECF 49). The Court granted several joint motions to extend the stay to allow the parties to continue their settlement dialogue to resolve the matter. (ECF 50-56, 58-65, 69-72). Plaintiffs met with mediator Judge Diane Welsh (Ret.) on January 26, 2022 and April 19, 2022. Plaintiffs filed their Motion for Preliminary Settlement Approval, Certification of the Settlement Class, and Approval of Class Settlement Notice on May 31, 2023, (ECF 74) which the Court granted on September 15, 2023 (ECF 85)[6].

---

[6] The delay in approval was due to a Motion to Intervene and Amended Motion to Intervene, and briefing by the parties on the proposed intervention (ECF 75-81). This Court denied the proposed intervention on September 7, 2023. (ECF 83, 84). The current objectors, Shawn and Jennifer Hummel, were proposed intervenors in the Amended Motion to Intervene.

4

**B.  Plaintiffs' Claims and Positions**

The UCC and MVSFA set forth very specific requirements for the Notices of Repossession that a creditor must provide to its borrower in connection with the repossession and resale of its collateral. It is Plaintiffs' position that the Notices of Repossession, which are to be sent immediately following a vehicle repossession, must comply with the UCC, independently, and in conjunction with the MVSFA *in pari materia*. Creditors are held to strict compliance with the post-repossession disclosure notice requirements of these statutes.

Pursuant to Pennsylvania statutory construction rules, "[s]tatutes or parts of statutes are *in pari materia* when they relate to the same persons or things or to the same class of persons or things." 1 Pa.C.S. §1932(a). "Statutes *in pari materia* shall be construed together, if possible, as one statute." 1 Pa.C.S. §1932(b). The UCC and MVSFA both set forth post-repossession disclosure notice requirements for secured parties who conduct self-help repossessions (other than by legal process with writ of replevin). These statutes relate to the same persons or things and/or to the same class of persons or things – i.e., debtors whose vehicles were repossessed outside the judicial process. Therefore, Plaintiffs maintain that these statutes are to be interpreted in *pari materia* and must be construed together.

Thirteen Pa.C.S. §9611 requires Wells Fargo to send a reasonable, authenticated notification of disposition (i.e., a Notice of Repossession) following a vehicle repossession providing the borrower with information about the repossession and the approaching sale of collateral and their right to redeem the vehicle back. Moreover, 13 Pa.C.S. §9610(b) prohibits the sale of the collateral if the disposition is not reasonable, which includes all aspects of the disposition from repossession to sale, including the sending reasonable post-repossession disclosure notices ("Notice of Repossession"). The MVSFA, 12 Pa.C.S. § 6254, also requires that

5

a Notice of Repossession be sent to the borrower after their vehicle is repossessed. The required contents of the Notice of Repossession are set forth in the UCC at 13 Pa.C.S. § 9614 (which also incorporates §9613), and in the MVSFA at 12 Pa.C.S. § 6254, in *pari materia* with the UCC. Thirteen Pa.C.S. §9616 also requires Wells Fargo to send Post-Sale Notices following the disposition (e.g. sale) of a repossessed vehicle containing certain information and requires that these notices be mailed in a certain manner.

Liability under the UCC does not require any showing of harm to the putative Class Members, or any reliance. Rather, "<u>every</u> noncompliance with the requirements of Part 6 in a consumer-goods transaction results in liability, <u>regardless of any injury that may have resulted</u>." Official Comment 4 to 13 Pa.C.S. § 9625 (Emphasis added). Further, the "notice requirement protects the debtor, and therefore should be construed strictly." *White & Summers, Uniform Commercial Code* § 34-12(b)(5th ed.). Moreover, 13 Pa.C.S. § 9625(a) states:

> **(a) Judicial orders concerning noncompliance.** If it is established that a secured party is not proceeding in accordance with this division, <u>a court may order or restrain collection</u>, enforcement or disposition of collateral on appropriate terms and conditions. (Emphasis added).

Plaintiffs allege, *inter alia*, that Wells Fargo, *inter alia*, failed to state in the Notices of Repossession the method of intended disposition and time and place of any public disposition of the motor vehicle, included expenses not incurred by Wells Fargo in the Notices of Repossession, failed to accurately state where the repossessed motor vehicle was stored, required payment of fees and expenses that were not actual, necessary, or reasonable, hired unlicensed repossession brokers, and failed to send Post-Sale Notices via registered or certified mail. Plaintiffs asserted that these consumer disclosure notice defects resulted in statutory violations which rendered the Notices of Repossession *per se* commercially unreasonable as a matter of law. Plaintiffs assert that any obligation arising from a deficiency balance is not owed. Plaintiffs allege that common factual

patterns underlie Plaintiffs' claims and the claims of the members of the proposed Class, as Wells Fargo mailed the same (or substantially similar) Notices of Repossession to Plaintiff and the Class Members, with the same alleged statutory violations. Plaintiffs further contend that any obligation arising from a deficiency balance is not owed. Plaintiffs also contend that Post-Sale Notices were not sent in the manner required.

### C. **Wells Fargo's Defenses and Positions**

For its part, Wells Fargo denies that Plaintiffs' claims have merit and denies all liability. Wells Fargo claims that it is entitled to pursue collection of the disputed deficiency balances and to retain any amounts paid toward them.

### D. **Class Counsel's Investigation**

Plaintiffs' counsel discovered enough information, through informal discovery, mediation, and settlement discussions, to evaluate the class's claims and the respective risks and benefits of the parties' claims and defenses sufficiently to engage a robust, productive mediation and settlement dialogue.

### E. **Settlement Negotiations**

The Settlement Agreement is the product of extensive and vigorous arms-length negotiations between the parties including through an experienced and well-respected mediator, Judge Diane M. Welsh (Ret.). The Parties engaged in two mediation sessions with Judge Welsh on January 26, 2022 and April 19, 2022. After mediation, and countless telephone conferences and letters (resulting in numerous drafts) over the course of more than a year to negotiate the detailed terms of the Settlement, the Parties made certain concessions and finally reached a settlement.

### III.  SUMMARY OF THE SETTLEMENT TERMS

The Parties have agreed to the terms of a Settlement Agreement to resolve the claims of all Class Members, and which would provide substantial benefits to them if final approval is granted. (**Exhibit 1**, Settlement Agreement). The key terms are set forth below.

### A.  **The Class and Class Notice**

Under the Settlement Agreement, the "Class" is defined as the collective group of (1) All debtors, obligors, and co-obligors: who entered into a retail instalment sales contract in Pennsylvania for the financing of a Motor Vehicle purchased primarily for personal, family or household use and whose retail installment sales contract was assigned or sold to Wells Fargo; and, (2) from whom Wells Fargo, as secured party, repossessed the vehicle or ordered it to be repossessed after Wells Fargo deemed the contract to be in default; and, (3) who were sent a Notice of Intent to dispose of or sell the repossessed vehicle by Wells Fargo at any time on or after July 7, 2014 through the date of Preliminary Approval.

Wells Fargo provided to the Court approved Settlement Administrator, Rust Consulting, a Notice List containing, *inter alia,* the following information for 22,340 Class Members: (i) the last five (5) digits of the Account number for each Account; (ii) the name(s) of the Class Member(s) associated with each Account such that it can be determined which Accounts have co-borrowers; (iii) the last known mailing address for each Class Member; (iv) the last known telephone number for each Class Member (if readily available within Wells Fargo's records) (to the Settlement Administrator only, to be provided to Class Counsel on an individual basis upon request to the Settlement Administrator or Wells Fargo); (v) the last known email address for each Class Member (if readily available within Wells Fargo's records); (vi) the Social Security Number for each Class Member (to the Settlement Administrator only); (vii) the total amount of the Refund Payments

associated with each Account; (viii) the amount of the finance charge; (ix) the amount financed; (x) the amount of any remaining Deficiency Balance associated with each Account; and (xi) whether an Account has been notated that a borrower or co-borrower is deceased. (**Exhibit 1**, ¶ 7.2).

Rust Consulting mailed the court approved Class Notice on November 14, 2023, which provided certain information and directed the Class Members to a website, www.VehicleRepoLawsuit.com. (Exemplar Class Notice, **Exhibit 3**; Declaration of Settlement Administrator, ¶ 12, **Exhibit 2**. There, Class Members could access copies of key case documents, including the operative Class Action Complaint, Settlement Agreement, Preliminary Approval Order, and the Class Notice in both English and Spanish.

The Settlement Administrator sent the Class Notice to 23,943 Class Members or their next of kin by U.S. First Class Mail, after first comparing the addresses against the NCOA database. (Affidavit of Settlement Administrator, ¶ 13, **Exhibit 2**). Class Notices returned with a forwarding address were remailed to the new address. 1,846 Class Notices were returned as undeliverable. (*Id.*, ¶ 14). The Settlement Administrator conducted three tracing activities on these undeliverable mailings, and the tracing activities yielded 353 new addresses. The Class Notices were remailed to the 353 newly updated addresses. (*Id.,* ¶ 14). The Settlement Administrator also sent email notices to 13,887 Class Members or their next of kin on November 14, 2023. (*Id.,* ¶ 15).

The Settlement Administrator created a settlement website which lists contact information for Class Counsel and the Settlement Administrator, as well as information relating to the dates and deadlines relevant to the settlement. (*Id.,* ¶ 16-17). As of January 20, 2024, there were 3,843 unique website visits to the settlement website and there were 587 phone calls to the Settlement Administrator. (*Id.,* ¶ 17-18). There were also 38 emails to the unique email address the Settlement

Administrator set up for this Settlement. (*Id.*, ¶ 18)

The deadline for Class members to object to the terms of the settlement or opt-out of the Class expired on December 26, 2023, 42 days after the mailing date of the Class Notice (which was mailed November 14, 2023). Eleven (11) Class Members associated with seven (7) Accounts have made valid requests to opt-out of the settlement, and there have been objections by three Class Members to the Settlement (Shawn Hummel (ECF 88), Jennifer Hummel (ECF 88), and Celeste Brooks Wade (ECF 89). Celeste Brooks Wade withdrew her objection, leaving two objectors, the Hummels. (ECF 90).[7]

**B.** **Monetary Relief**

**1. Settlement Payment**

Following preliminary approval, Wells Fargo deposited the sum of Fifteen Million Dollars ($15,000,000.00) into an interest-bearing Qualified Settlement Fund ("QSF") account with the Settlement Administrator. Per Class Counsel's instruction and with approval of the Court, the Class Administrator has invested the $15 million in U.S. Treasury Bills. (See **Exhibit 2**, ¶ 20-22).

The $15,000,000 Settlement Fund will be used to: (a) pay "Refund Payments" totaling approximately $6.87 million to those Class Members whose vehicles were repossessed and sold (or otherwise disposed of) and who subsequently made payments towards their disputed Deficiency Balances; (b) pay "Per Account Payments" to each Settlement Class Member on a per Account basis (based on the total number of Accounts and the total amount remaining in the Settlement Fund after the Refund Payments and payment of settlement administration costs, incentive awards to the Class Representatives, and Attorneys' Fees and Expenses); (c) pay the

---

[7] Of note, her "objection" relating to unique matters pertaining to her experience with Wells Fargo in connection with the servicing of her loan, not to the terms of the settlement. After Class Counsel's consultation with Ms. Wade explaining, *inter alia*, the benefits of the settlement, she withdrew her objection.

Incentive Awards, (d) pay the costs of settlement administration; and, (e) pay Attorneys' Fees and Expenses.

In the case of Accounts that list more than one person as a borrower or co-borrower, the amount of the Refund Payment (if applicable) and Per Account Payment for that Account will be divided equally among borrowers or co-borrowers with separate checks issued to each as no co-borrower or their legal representative timely submitted a request to the Settlement Administrator for an alternative division.

Refund Payments and Per-Account Payments for Accounts with more than one borrower where the Settlement Administrator can determine that one of the co-borrowers is now deceased will be paid to the surviving co-borrower, absent a request by the executor or administrator or legal representative of the estate of the deceased co-borrower, supported by documentation sufficient to show an open estate and one or more persons legally entitled to the payment. Any such requests will be denied unless there is an opened/reopened estate at the time of the request and/or upon approval of Class Counsel.

Accounts with only one borrower where the Settlement Administrator can determine that a borrower is deceased will not be paid absent a request by the executor, administrator, or legal representative of the estate of the deceased coborrower, supported by documentation sufficient to show an open estate and one or more persons legally entitled to the payment. Any such requests will be denied unless there is an opened/reopened estate at the time of the request and/or upon approval of Class Counsel.

Within sixty (60) days of the Effective Date, the Settlement Administrator will issue payment to the Class Members for their Refund Payments (as applicable) and their Per Account Payments (the "Distribution Date"). The Settlement Agreement provides that for Class Members

11

whose checks are returned as undeliverable, the Settlement Administrator will seek an address correction via Accurint, TransUnion, and/or Experian batch trace, and as may be necessary skip tracing, and then re-send the checks to any subsequently obtained address that the Settlement Administrator reasonably believes to be valid. Any settlement checks that are returned as undeliverable after a second attempt at mailing and all settlement checks that are not cashed within 120 days of the Distribution Date will be voided.

Significantly, Class Members whose checks are not cashed within 120 days of the Distribution Date will be ineligible for any other distributions. For those Class Members who cash their respective settlement check, they will be sent additional settlement checks in subsequent distributions on a per-Account basis provided that there is $15,000 or more remaining in the Settlement Fund. The amount of the subsequent distributions may exceed the initial distribution, depending upon the cash rate of the first distribution and the amount then remaining in the Settlement Fund.

Within 14 days of voiding any uncashed checks from the initial distribution, the Settlement Administrator will notify counsel of the number of Class Members who cashed their settlement check, the number of Class members who did not cash their checks, the total dollar amount of the checks distributed by the Settlement Administrator, and the total dollar amount of uncashed checks. At that time, if there is $15,000 or more remaining in the Settlement Fund, the Settlement Administrator will make a Second Distribution on a per-Account basis, if reasonable and feasible based on the amount remaining and number of checks to be issued, by taking the amount remaining in the Settlement Fund divided by the number of Accounts eligible to share in the Second Distribution (to be paid to those Class Members who cashed their settlement check in the First Distribution). If a Second Distribution is made, checks that are not cashed within 60

days of the Second Distribution date will be voided.

Within 14 days of voiding any uncashed checks from the Second Distribution the Settlement Administrator will notify counsel of the number of Class Members who were sent checks, the number of Class Members who did not cash their checks, the total dollar amount of the checks distributed by the Settlement Administrator, and the total dollar amount of uncashed checks from the Second Distribution. If there is $15,000 or more remaining in the Settlement Fund, if reasonable and feasible based on the amount remaining and the number of checks to be issued, the Settlement Administrator will make a Third Distribution. If applicable, the Third Distribution will be made on a per-Account basis, by taking the amount remaining in the Settlement Fund divided by the number of Accounts eligible to share in the Third Distribution (to be paid to those Class Members who cashed their settlement check in the First Distribution). If a Third Distribution is made, checks that are not cashed within 60 days of the Third Distribution date will be voided. Within 14 days of voiding any uncashed checks from the Third Distribution the Settlement Administrator will notify counsel of the number of Class Members who were sent checks, the number of Class Members who did not cash their checks, the total dollar amount of the checks distributed by the Settlement Administrator, and the total dollar amount of uncashed checks from the Third Distribution.

If there is $15,000 or more remaining in the Settlement Fund, if reasonable and feasible based on the amount remaining and number of checks to be issued, the Settlement Administrator will make a Fourth Distribution. If applicable, the Fourth Distribution will be made on a per-Account basis, by taking the amount remaining in the Settlement Fund divided by the number of Accounts eligible to share in the Fourth Distribution (to be paid to those Class Members who cashed their settlement check in the First Distribution). If a Fourth Distribution occurs, checks that

13

are not cashed within 60 days of the Fourth Distribution date will be voided.

After the Fourth Distribution, any remainder will be paid to Cy Pres Recipient(s) who the parties will designate, subject to Court approval. Potential recipients will be presented for the Court's consideration at the Fairness Hearing. One prospective mutually agreeable *cy pres* recipient is the Pennsylvania Legal Aid Network which provides legal assistance to low income consumers in every county in Pennsylvania.

### 2. Compromise of Disputed Deficiency Balances through an Accord and Satisfaction

The Settlement Agreement provides that upon the Effective Date, Wells Fargo will stop collecting on the disputed Deficiency Balances alleged to be owed by each Settlement Class Member whose vehicle was sold or otherwise disposed of following the repossession and compromise same by an accord and satisfaction. Any payments made by Settlement Class Members towards their Deficiency Balances after the Effective Date will be returned by Wells Fargo. This compromise would result in $66.7 million in *additional* benefit conferred on the Class by way of the accord and satisfaction of the compromised Deficiency Balances.

The Class Notice advises Class Members that those Class Members who would receive a Deficiency Balance Compromise (as identified in the Notice), and are not excluding themselves from the Settlement, should stop paying on the Deficiency Balance amount immediately, pending the final outcome of Plaintiffs' request for entry of a Final Approval Order.

It is Plaintiffs' position that the elements of an accord and satisfaction have been satisfied by this compromise of the Deficiency Balances. See *Niles v. Metropolitan Casualty Insurance Co. of New York*, 317 Pa. 545, 177 A. 754 (1935); *King v. Boettcher*, 616 A.2d 57 (Pa. Commw. Ct. 1992) (setting forth the elements of an accord and satisfaction). Here, a good faith dispute existed

as to the validity of the Deficiency Balances arising from the class member's retail installment contract (**Exhibit 1**, Settlement Agreement, §1.18, §1.19, §1.37) and arm's length and good faith negotiations occurred between Wells Fargo's counsel and Class Counsel regarding the reasonable dispute over whether the debt was owed (See, *Id.*§21.2), resulting in monetary and other consideration paid by Wells Fargo in exchange for the full settlement of any and all claims against the borrowers relating to the disputed Deficiency Balances. (See, *Id.*, §3.2, §3.3, §10.6). The Deficiency Balances are disputed liabilities that are being fully compromised by way of an accord and satisfaction. (See *Id.*, §1.18).

While the Class Notice clearly states the Class Member should consult a tax professional about the taxability of this claim[8], there are good grounds to contest any tax assessment due to the accord and satisfaction language of the Settlement Agreement and the "contested liability doctrine." Plaintiffs contend that the compromise of this disputed deficiency balance should not be deemed taxable income pursuant to the "contested liability" doctrine. See, *Zarin v. Commissioner of Internal Revenue*, 916 F.2d 110 (3d Cir. 1990). Wells Fargo may issue IRS 1099-C forms to Class Members for the Deficiency Balance Compromise, though it makes no representations as to the taxability of any portions of the relief provided to Settlement Class Members.

Plaintiffs wish to confer with the Court and the Clerk of Court regarding the possibility of a customized order for each Settlement Class Member regarding the non-taxability of the

---

[8] The proposed Class Notice states: **Will this affect my taxes? We cannot give you a definitive answer in this Notice.** A Deficiency Balance Compromise in an amount of $600.00 or more may result in the issuance of IRS Form 1099C. You should consult a tax professional regarding tax implications because all situations are unique. It is most prudent to consult your tax professional about your unique tax situation. **You are urged to consult with a tax professional regarding the benefits and tax implications of this Settlement. You should retain this document for tax purposes.** §14 of Class Notice (Emphasis in original). **Exhibit 3**.

Deficiency Balance compromises. A copy of a customized order used by the undersigned in a similar post-repossession consumer disclosure notice class action which was certified by the Court of Common Pleas of Jefferson County is attached for the Court's review. **Exhibit 4**. Class Counsel would like to arrange for the sending of a similar order to all Class Members if logistically feasible with the Clerk's office and approved by the Court.

### 3. Expungement or Satisfaction of Deficiency Judgements

If any Deficiency Judgments exist, within 60 days of the Effective Date, Wells Fargo agrees to file satisfactions of judgment for all Class Members with judgments entered against them for their disputed Deficiency Balances on the loans that are the subject of this Action, with the exception of judgments that have already been satisfied or have lapsed or have been extinguished due to the passage of time. Wells Fargo will also not oppose a request which will be made by Class Counsel for the expungement of any deficiency judgement. Class Counsel will undertake the

### C. <u>Non-Monetary Relief – Requests for Deletion of Tradelines and Credit Repair</u>

The settlement also provides additional non-monetary, but valuable class relief. Within 60 days of the Effective Date, Wells Fargo will submit requests to the three major Credit Reporting Agencies, and to any other credit reporting agency to which Wells Fargo reports, to delete the entire tradelines associated with each Settlement Class Member's Account, with the exception of any Accounts where the borrower has requested to be excluded from the tradeline deletion. If an item fails to get deleted or the reporting reoccurs on any Account after Wells Fargo's initial request, Class Counsel will provide written notice to counsel for Wells Fargo explaining the basis for a belief that a tradeline was not deleted that should have been, and Wells Fargo will submit another request to the Credit Reporting Agencies for this relief.

### D. **Releases**

In exchange for the consideration set forth in the Settlement Agreement the named

Plaintiffs and the Class Members will release Wells Fargo (and its subsidiaries, parent companies,

officers, directors, etc.) as follows:

> On the Effective Date, Releasors, including but not limited to the Class
> Representatives, on their own behalf and on behalf of each Settlement Class Member,
> by operation of this Release and the Judgment set forth in the Order of Final Approval,
> do hereby and shall be deemed to have fully, finally, conclusively, irrevocably, and
> forever released, settled, compromised, relinquished, and discharged any and all of the
> Released Parties of and from any and all Released Claims and, without further action
> by any person or the Court, will be deemed:  (a) to have consented to dismissal of the
> Action and the dismissal with prejudice of any and all Released Claims; (b) to have
> released and forever discharged any and all Released Claims; and (c) to be forever
> barred from instituting or further prosecuting, in any forum whatsoever, including but
> not limited to any state, federal, or foreign court, or regulatory agency, or any
> arbitration forum, each and every Released Claim.

(See **Exhibit 1**, Settlement Agreement, §10.1).

The term "Released Claims" (which defines the claims being released by Plaintiffs and

Class Members) is defined in the Settlement Agreement as:

> "Released Claims" mean any and all claims, defenses, demands, actions, causes of
> action, offsets, setoffs, suits, damages, lawsuits, costs, relief for contempt, losses,
> attorneys' fees, expenses, or liabilities of any kind whatsoever in law or in equity, for
> any relief whatsoever, including monetary, sanctions or damage for contempt,
> injunctive, or declaratory relief, rescission, general, compensatory, special, liquidated,
> indirect, incidental, consequential, or punitive damages, as well as any and all claims
> for treble damages, statutory damages, contribution or indemnity, penalties, interest,
> attorneys' fees, costs, or expenses, whether a known or Unknown Claim, suspected or
> unsuspected, contingent or vested, accrued or not accrued, liquidated or unliquidated,
> matured or unmatured, that in any way concern, arise out of, or relate to: (1) allegations
> that were or could have been asserted in the Second Amended Complaint against the
> Released Parties; (2) any claim regarding or relating to a Notice of Repossession,
> Notice of Intent, and/or Post Sale Notice; (3) the origination, financing, assignment,
> and servicing of any Account; (4) the repossession, surrender to, and control of any
> vehicle by Wells Fargo or any individual or entity acting on its behalf relating to any
> Account; (5) the charging, payment, collection, and attempted collection of amounts
> relating to any Account; (6) any notice or other communication delivered or required
> to be delivered before, after, or otherwise in connection with the repossession,
> surrender, control, or disposition of any vehicle relevant to any Account; (7) any sale

or disposition of any vehicle related to any Account; (8) the furnishing of information to Credit Reporting Agencies related to any Account; or (9) any claim arising out of or relating to the Uniform Commercial Code and the Pennsylvania Motor Vehicle Sales Finance Act related to an Account. The Released Claims do not include (a) claims arising out of the failure of any Party to perform in conformity the terms of this Agreement; or, (b) any other loan or account Wells Fargo has (or has had) with any Settlement Class Member, not encompassed by this Action.

(*Id.*, §1.38).

Wells Fargo will release Plaintiffs and Class Members as follows:

On the Effective Date, Wells Fargo, by operation of this Release and the Judgment set forth in the Order of Final Approval, does hereby and shall be deemed to have fully, finally, conclusively, irrevocably, and forever released, settled, compromised, relinquished, and discharged any and all of the Settlement Class Members, as well as their heirs and assigns, of and from any and all Released Wells Fargo Claims. This release is not intended to and does not affect any other accounts that Settlement Class Members or their heirs and assigns may have with Wells Fargo. Nothing in this Release or Agreement shall be construed as a limitation on Wells Fargo from accepting payment, repossessing vehicles, administering collections, or obtaining judgment on Accounts encompassed by this Action that were reinstated and do not have a Deficiency Balance as of the Effective Date, nor shall it be construed as impacting any continuing obligation of Settlement Class Members to make payments on an Account where it is reinstated as of the Effective Date and payments continue to be due as of the Effective Date.

(*Id.*, §10.6).

The term "Released Wells Fargo Claims" (which defines the claims being released by

Wells Fargo) is defined in the Settlement Agreement as:

1.39. "Released Wells Fargo Claims" mean any and all claims, defenses, demands, actions, causes of action, offsets, setoffs, suits, damages, lawsuits, costs, relief for contempt, losses, attorneys' fees, expenses, or liabilities of any kind whatsoever in law or in equity, for any relief whatsoever, including monetary, sanctions or damage for contempt, injunctive, or declaratory relief, rescission, general, compensatory, special, liquidated, indirect, incidental, consequential, or punitive damages, as well as any and all claims for treble damages, statutory damages, contribution or indemnity, penalties, interest, attorneys' fees, costs, or expenses, whether a known or Unknown Claim, suspected or unsuspected, contingent or vested, accrued or not accrued, liquidated or unliquidated, matured or unmatured, that in any way concern, arise out of, or relate to: (1) claims that Wells Fargo could have asserted in the Action that arise out of or relate to the Account; or (2) any claim regarding or relating to the Notice of Repossession or any claim

relating to the repossession or disposition of Settlement Class Member's vehicles, including collection of Settlement Class Members' Deficiency Balances that Wells Fargo is fully compromising as part of this Agreement. This release is not intended to and does not affect (a) claims arising out of the failure of any Party to perform in conformity the terms of this Agreement; (b) any other accounts that Settlement Class Members may have with Wells Fargo not encompassed by this Action; (c) claims or defenses arising from any repossession or relating to the Account occurring after the Class Period. Nothing in this Release or Agreement shall be construed as a limitation on Wells Fargo from accepting payment, repossessing vehicles, administering collections, or obtaining judgment on Accounts encompassed by this Action that were reinstated and do not have a Deficiency Balance as of the Effective Date, nor shall it be construed as impacting any continuing obligation of Settlement Class Members to make payments on an Account where it is reinstated as of the Effective Date and payments continue to be due as of the Effective Date.

(*Id.*, §1.39).

Wells Fargo acknowledges that any mitigation efforts it has undertaken will ***not*** be affected by this settlement. ECF 98.

> Finally, and critically, Wells Fargo's remediation efforts on accounts will not be impacted or discontinued in any way as a result of the release in this class settlement. If there are issues to be remediated on accounts, the release in this class action settlement will not bar future payments— those are determined entirely independently of any release here. *Id.*, p. 6.

**E. Settlement Administration**

The Settlement Agreement sets forth in detail the agreed class settlement procedures, including, *inter alia*: (i) the submission of this Motion; (ii) the manner of notifying the Class Members of the Settlement and their rights in respect thereof, including the contents and form of the proposed Class Notice, a copy of which is attached as **Exhibit 3**; (iii) the manner, form, and timing for Class Members to object to the Settlement or request exclusion from the Class; (iv) the motion for final approval; and, (v) the appointment of a Settlement Administrator to administer the Settlement.

19

## IV.  ARGUMENT

### A.  <u>Final Approval of the Settlement Agreement Should be Granted</u>

This Court has preliminarily determined that class certification appears appropriate for settlement purposes and has preliminarily approved the Agreement. (ECF 85). The Settlement presented for the Court's consideration is fair, reasonable, and adequate, and warrants final approval. It follows significant informal investigation by Class Counsel over more than a year of hard-fought litigation, and is the product of approximately one year of intense settlement negotiations to resolve numerous complicated, contentious issues.

#### 1.  Legal Standard for Final Approval

Fed. R. Civ. P. Rule 23(e) requires a district court to approve any settlement of a certified class before the settlement becomes final. The purpose of Rule 23(e) is to protect the unnamed members of the class. *In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 534 (3d Cir.2004). Under Rule 23(e), a district court acts as a fiduciary, guarding the claims and rights of the absent Class Members. *In re AT & T Corp.,* 455 F.3d 160, 175 (3d Cir.2006); *In re General Motors Corp. Pick–Up Truck Fuel Tank Prods. Liability Litig.,* 55 F.3d 768, 782 (3d Cir. 1995). However, it is also well-established that there is an overriding public interest in settling and quieting litigation in Federal courts. There is a "strong presumption in favor of voluntary settlement agreements" that the Third Circuit has "explicitly recognized with approval." *Ehrheart*, 609 F.3d at 594, *citing Pennwalt Corp. v. Plough*, 676 F.2d 77, 79-80 (3d Cir. 1982). This presumption is "especially strong in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation. *Ehrheart,* 609 F.3d at 595; *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d at 784. The strong judicial policy in favor of class

action settlement "contemplates a circumscribed role for the district courts in settlement review and approval proceedings." *Id.*

In evaluating a class action settlement under Rule 23(e), a district court determines whether the settlement is fundamentally fair, reasonable, and adequate. *Fed. R. Civ. P. 23 (e)(2). See also, Ehrheart v. Verizon Wireless*, 609 F.3d 590, 592-93 (3d Cir. 2010); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 534 (3d Cir. 2004)). A presumption of fairness, adequacy, and reasonableness attaches where: (1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery (either formal or informal); (3) the proponents of the settlement are experienced in similar litigation; and, (4) only a small fraction of the class objected. *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d at 535; *In re Cendant Corp. Litig.*, 264 F.3d 201, 232, footnote 18 (3d Cir. 2001); *In re Nat. Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 387 (E.D. Pa. 2015) (citing cases).

The substance of a proposed class action settlement is evaluated by applying the (mandatory) factors set forth in *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975), and applying the (permissive) factors set forth in *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283 (3d Cir. 1998) and *In re Baby Prod. Antitrust Litig.*, 708 F.3d 163 (3d Cir. 2013), where applicable. See *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d 316, 329 (3d Cir. 2019); *Ward v. Flagship Credit Acceptance LLC*, 2020 WL 759389, at *11 (E.D. Pa., 2020); *In re Comcast Corp. Set-Top Cable Television Box Antitrust Litig.*, 2019 WL 4645331, at *11 (E.D. Pa., 2019).

In *Girsh*, the Third Circuit set forth the following specific factors that a court must consider in determining whether a settlement is fair, reasonable, and adequate:

(a) the complexity, expense and likely duration of the litigation;

21

(b) the reaction of the class to the settlement;

(c) the stage of the proceedings and the amount of discovery completed;

(d) the risks of establishing liability;

(e) the risks of establishing damages;

(f) the risk of maintaining the class action through the trial;

(g) the ability of the defendants to withstand a greater judgment;

(h) the range of reasonableness of the settlement fund in light of the best possible recovery; and,

(i) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Girsh,* 521 F.2d at 157; *In re Nat. Football League Players' Concussion Inj. Litig.,* 307 F.R.D. 351, 388 (E.D. Pa. 2015) (citing *Girsh*), *aff'd,*821 F.3d 410 (3d Cir. 2016).

After *Girsh,* the Third Circuit has suggested additional factors to consider, whether: (a) the pleadings, settlement negotiations, and the class certification motion have developed the underlying substantive issues such that all parties may assess the merits of the claims and defenses; (b) members of the Class have had a sufficient opportunity to opt out of the settlement; (c) the awards to the Representative Plaintiffs are fair, adequate and reasonable; and (d) the procedures for processing the individual claims under the settlement are fair and reasonable. *In re Prudential Sales Prac. Litig.,* 148 F.3d 283, 323 (3d Cir. 1998); *In re NFL Players,* 307 F.R.D. at 395-96.

In *Baby Products,* the Third Circuit articulated another consideration for evaluating a settlement: "the degree of direct benefit provided to the class." *In re Baby Prod. Antitrust Litig.,* 708 F.3d at 174. In making this determination, the Court may consider the number of individual awards compared to both the number of claims and the estimated number of Class Members, the size of the individual awards compared to claimants' estimated damages, and the claims process

22

used to determine individual awards. *Id.* In *Baby Products,* the Court also noted that "[t]he role of a district court [in evaluating a class action settlement] is not to determine whether the settlement is the fairest possible resolution – a task particularly ill-advised given that the likelihood of success at trial (on which all settlements are based) can only be estimated imperfectly. The Court must determine whether the compromises reflected in the settlement…are fair, reasonable, and adequate when considered from the perspective of the class as a whole." *In re Baby Prod. Antitrust Litig.*, 708 F.3d at 173–74 (3d Cir. 2013).

Federal Rule 23(e)(2), which went into effect December 1, 2018, enumerates similar factors. [9] This Rule states:

> (e) SETTLEMENT, VOLUNTARY DISMISSAL, OR COMPROMISE. The claims, issues, or defenses of a certified class – or a class proposed to be certified for purposes of settlement – may be settled, voluntarily dismissed, or compromised only with the court's approval. The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:
>
> …
>
> > (2) *Approval of the Proposal.* If the proposal would bind Class Members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:
> >
> > > (A) the class representatives and class counsel have adequately represented the class;
> > >
> > > (B) the proposal was negotiated at arm's length;
> > >
> > > (C) the relief provided for the class is adequate, taking into account:
> > >
> > > > (i) the costs, risks, and delay of trial and appeal;

---

[9] In *Ward v. Flagship Credit Acceptance LLC*, the Court explained that "[t]he Third Circuit's instruction to apply the *Girsh* factors, *Prudential* considerations, and *Baby Products* considerations postdates the 2018 amendments to Rule 23. Accordingly, the Court will adhere to this direction and analyze the fairness, reasonableness, and adequacy of the proposed settlement under the Third Circuit's framework, recognizing that this analysis addresses the 'core concerns' identified in Rule 23(e)(2)." *Ward v. Flagship Credit Acceptance LLC*, 2020 WL 759389, at *11, footnote 18 (E.D. Pa., 2020), citing *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d 316, 329 (3d Cir. 2019); *In re Comcast Corp. Set-Top Cable Television Box Antitrust Litig.*, 2019 WL 4645331, at *11 (E.D. Pa., 2019).

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats Class Members equitably relative to each other.

Fed. R. Civ. P. Rule 23(e)(2).

## 2. Analysis of the *Girsh* and Rule 23(e)(2) Factors

An evaluation of the relevant factors demonstrates that the settlement here fits well within the range of reasonableness and should be approved. Notably, the mediator in this case made a Declaration of Hon. Diane M. Welsh (Ret.) of JAMS in Support of Proposed Class Settlement (**Exhibit 5**), detailing the settlement negotiations and stating, *inter alia*,

> In my opinion, the proposed Settlement was the result of fair, thorough, and fully-informed arm's-length negotiations between highly capable, experienced, and informed parties and counsel. The Settlement represents the parties' and counsel's best efforts and judgments after thoroughly investigating the case, considering the risks, strengths, and weaknesses of their respective positions on substantive issues, the risks, burdens, delays and costs of continued litigation, and the best interests of their respective clients.

### (a) The Complexity, Expense and Likely Duration of the Litigation

The first factor captures the probable costs, in both time and money, of continued litigation. *In re NFL Players*, 821 F.3d 410, 436-37 (3d Cir. 2016). Should this case continue, Plaintiffs would have had to undergo the significant delay and expense, risks associated with a contested class certification motion, dispositive motions, trial, and, potentially, an appeal. The Settlement avoids all of these uncertainties while delivering very substantive relief to 22,329 Class Members (22,340 Class Members minus 11 class members with valid opt out requests (See ECF 91 and Declaration of Settlement Administrator, ¶19 (**Exhibit 2**). Early settlement of this action provides Class Members with a cash benefit (including approximately $6.87 million in Refund Payments

to eligible Class Members), a credit tradeline expungement benefit, and the full compromise of the Class Members' disputed Deficiency Balances of approximately $66.7 million.

Significantly, the UCC makes no specific, express provision for credit expungement to ameliorate a credit injury, although Plaintiffs assert that such relief is clearly permitted under the UCC's equity provisions (13 Pa.C.S. §1103(b)). Additionally, a settlement allows the parties to negotiate terms favorably considering the potential tax liability issue pertaining to the consumers (i.e., compromise of the disputed Deficiency Balances by way of an accord and satisfaction). Whether the Court, however, would adjudicate that the (disputed) Deficiency Balances should be compromised or otherwise uncollectible is not beyond challenge if the case were to proceed. The Settlement avoids the potential risks with respect to these legal determinations as well.

### (b) The Reaction of the Class to the Settlement

The Opt-Out Deadline and Objection Deadline was December 26, 2023. The Settlement has been well received by the Class. As set forth above, three Class Members filed objections, and one withdrew their objection, leaving two objections (the Hummel's Objection) which Plaintiffs believe are baseless and are responding to by separate filing.  Only eleven Class Members related to seven accounts have opted out.  The Class Members had sufficient opportunity to object or opt-out, as they were given 42 days from the Class Notice mailing date.

### (c) The Stage of the Proceedings and Investigation of Claims and Defenses

Plaintiffs' Counsel, Richard Shenkan, who has significant experience in these types of cases (including settling a number of class actions with similar Notice of Repossession and Post-Sale Notice violation claims), conducted considerable pre-complaint and post-complaint investigation. This case was heavily litigated for approximately 16 months before successfully convincing the Defendant to open settlement dialogue with the aid of a mediator on a class-wide

basis. Plaintiffs' Counsel learned further information about the case and the claims during the mediation and other settlement negotiations.

This all provided sufficient information for Plaintiffs' Counsel to assess and appreciate the legal issues/hurdles, the strengths and weaknesses of the claims on the merits (and for class certification), and the potential value of the claims in consideration of these factors, and to evaluate the outcome of a trial on the merits of liability and damages. *See In re NFL Players,* 821 F.3d at 439 ("What matters is not the amount or type of discovery class counsel pursued, but whether they had developed enough information about the case to appreciate sufficiently the value of the claims."). *See also, In re Prudential Insurance Co.,* 148 F.3d 283, 319 (3d Cir. 1998).

Plaintiffs' claims are predominantly focused on defects in form consumer disclosure notices, and statutory damages are formulaic. Wells Fargo provided Plaintiffs with information regarding class size and damages. Wells Fargo has also stated the number of Accounts and Class Members as of a certain date in the Settlement Agreement. Plaintiffs' Counsel, who has significant experience in these types of cases, was fully able to appreciate the potential value of the claims and the benefits of this settlement before settling this matter.

### (d) and (e) The Risks of Establishing Liability and Damages

The fourth and fifth *Girsh* factors survey the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement. *In re Prudential Insurance Co.,* 148 F.3d 283, 319 (3d Cir. 1998). While Plaintiffs submit that they have a strong case, Wells Fargo vigorously disputes Plaintiffs' claims.

Additionally, while the statutory minimum damages flowing from such a liability finding would be straightforward and easy to calculate, the additional equitable remedies requested by

Plaintiffs – including the requests for deletion of the credit tradelines – while well-founded in Plaintiffs' view, have yet to be the subject of any decisional appellate authority in Pennsylvania or the Third Circuit. This factor, therefore, strongly counsels in favor of preliminarily approving the Settlement, which provides for these equitable remedies.

### (f)  The Risk of Maintaining the Class Action through the Trial

Because the Settlement avoids the risk of obtaining and keeping class certification through trial, this factor weighs in favor of the Settlement, although as the Third Circuit has noted, it bears little consideration in this context. See *In re NFL Players*, 821 F.3d at 440: "In a settlement class, this factor becomes essentially 'toothless' because "'a district court need not inquire whether the case, if tried, would present intractable management problems[,] ... for the proposal is that there should be no trial.' *Prudential*, 148 F.3d at 321 (quoting *Amchem*, 521 U.S. at 620, 117 S.Ct. 2231)."

This Court made a preliminary determination on class certification for purposes of preliminary approval (ECF No. 85). Plaintiffs believe each of the elements for class certification under Rule 23 are readily met here, that the Class could have been certified even if contested, and that the Class should be finally certified here for settlement. Settlement eliminates the need to litigate the issue of class certification. While Plaintiffs believe they have the better of the arguments regarding certification, this *Girsh* factor favors approval of the Settlement because it avoids the potential risk of failing to obtain initial class certification and failing to maintain same through trial.

### (g)  The Ability of the Defendant to Withstand a Greater Judgment

The seventh *Girsh* factor considers "whether the defendants could withstand a judgment for an amount significantly greater than the settlement." *In re Warfarin*, 391 F.3d at 537-38.

Plaintiffs have no reason to believe that Wells Fargo could not withstand a judgment greater than the proposed Settlement, but in light of the other factors, this does not counsel against a favorable settlement. *See Sullivan v. DB Investments, Inc.,* 667 F.3d 273, 323 (3d Cir. 2011) ("in any class action against a large corporation, the defendant entity is likely to be able to withstand a more substantial judgment").

### (h) and (i) The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and All the Attendant Risks of Litigation

*In re NFL Players,* 821 F.3d at 440, the Third Circuit explained that

> In evaluating the eighth and ninth *Girsh* factors, [the Court asks] whether the settlement represents a good value for a weak case or a poor value for a strong case. The factors test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial.

At the same time, the Court must "guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution." *Sullivan,* 667 F.3d at 324 (*quoting In re General Motors,* 55 F.3d at 806).

The Settlement provides substantial relief to the Class Members. The full compromise of approximately $64.39 million in (disputed) Deficiency Balances is an important monetary component of the Settlement in addition to the substantial cash payment. Indeed, if the Parties had not agreed to a settlement and litigation continued, Wells Fargo would likely claim that it has the right to a setoff of the Class Members' Deficiency Balances against any monetary recovery awarded to the Class Members. This Settlement precludes the potential of a $64.39 million setoff against a judgment. The cash amount in the Settlement Fund of approximately $15.25 million ($15 million cash settlement payment, plus approximately $255,000.00 in interest earned in the

28

investments in U.S. Treasury Bills), the full compromise of approximately $66.7 million in the disputed Deficiency Balances, and the value of the fully exhaustive credit reparation (removal of 100% of the credit tradeline) is extremely valuable, albeit difficult to quantify – with a potential value of somewhere between $15.25 million and $223.29 million (discussed below) – totals between approximately $97.2 million and $290 million.  Without taking the credit repair into account, the quantifiable $15.25 million Settlement Fund plus the $66.7 million in the compromise of disputed Deficiency Balances totals approximately $81.95 million. Moreover, Wells Fargo has agreed to work collaboratively with Class Counsel to investigate and file satisfaction of deficiency judgments, if any, are discovered.

The Settlement offers valuable non-monetary relief to the Class Members, including Wells Fargo's agreement to request the complete deletion of the credit tradelines associated with the Class Members' subject Accounts, which show both the alleged default (including an unfavorable payment history) *and* all reference to the subject repossession (and the negative impact of same).

It cannot be underestimated how an adverse report lowers credit scores and can negatively affect the class member's cost of credit and even their access to housing, insurance, and employment. See, Expert Report of Thomas A. Tarter, **Exhibit 6**. As noted above, while Plaintiffs believe they have a legitimate basis to seek such equitable relief based on the alleged statutory and common law violations at issue, the Third Circuit has yet to make a pronouncement whether Plaintiffs could obtain such relief if they litigated their claims to decision.

It is likely that most (if not all) Class Members will benefit significantly from credit repair by the requested deletion of the negative Wells Fargo tradeline including any information pertaining to repossession, an unfavorable payment history, a charge off; and/or a (disputed) deficiency balances. This benefit will likely result in significantly better credit terms and

conditions, including lower interest rates and a highly improved access to credit. (See Expert Report of Thomas A. Tarter, **Exhibit 6**).

As stated by Mr. Tarter in his Report, "All Class Members (with 'good credit' or 'bad credit') will significantly benefit from credit repair by the deletion of the negative Wells Fargo trade line…" and "will, more likely than not, increase Class Members' credit scores by approximately 50 to 125 points". (*Id.,* pp. 9-10). Other benefits of credit repair include reduced negative effects of bad credit on lost income, impact on employment, insurance costs, loss of credit expectancy, financial stigma, and quality of life. (*Id.*, p. 10).

This credit repair eliminates all negative information related to the Account that could adversely impact security clearances, employment opportunities, insurance rates, and housing opportunities. *See* Lea Shepard, *Seeking Solutions to Financial History Discrimination,* 46 Conn. L. Rev. 993, (2014). Further, it eliminates any tendencies for Class Members to simply not apply for credit because of a perception that their credit application would be rejected because of negative credit information relating to the default and repossession of their vehicles by Wells Fargo.

Some Courts have opined that the value of this credit repair through the tradeline deletion should be at least equal to the cash component of the settlement, here $15,000,000.00 which at the time of distribution of payments to Class Members will have increased to approximately $15.25 million due to investment of the Settlement Fund by the Settlement Administrator in this case. See e.g., *Ciccarone v. B.J. Marchese, Inc.,* 2004 WL 2966932 at *10 (E.D. Pa., 2004); *Dudo, et* al., v. *Capital One Auto Finance,* 296-2020 (Jefferson County CCP 2020). Thus, under this approach the value of the credit repair would be $15.25 million. However, other Courts have opined that the value of this credit repair should be an amount up to $10,000 per class member.[10] As there are

---

[10] *See Universal Credit Acceptance, Inc. v. Myers*, No. 15JE-AC05976-01 (Mo. Cir. Feb. 8, 2021); *see also*

22,329 Class Members in the present case, under this approach the credit tradeline deletion may be worth up to approximately $223.29 million.

The substantial monetary and non-monetary relief offered in the Settlement, when contrasted to the risks of litigation – both with respect to the merits of Plaintiffs' claims and Wells Fargo's defenses and with respect to class certification – weigh heavily in favor of final approval of the Settlement.

### 3. Additional Factors

There are other relevant, permissive factors suggested in *In re Prudential* which the Court may also consider (which are not addressed above in the *Girsh* analysis). Counsel realizes that an analysis of the reasonableness of attorney fees is generally to be determined at the final hearing ***after*** the class has an opportunity to object to the settlement[11]. However, a brief discussion relating to the attorney fee to be sought, as stated in the proposed Class Notice, may be warranted.

---

*Anheuser Busch Employees' Credit Union v. Wells*, Case No. 1522-AC09263-01 (Mo. Cir. July 10, 2018), and *Jackson v. Missouri Credit Union*, Case No. 18BA-CV0665 (Mo. Cir. March 14, 2022) (which called the $10,000 a "conservative" valuation). As summarized by the Court in *Jackson*, *supra*:

> *Myers* and *Wells* were similar class actions based on the same types of violations (UCC notices) and remedies sought (statutory damages, deletion of negative credit tradeline, deficiency waiver). A credit damages expert estimated the benefit of having the negative auto loan tradeline deleted from the Class Members' credit reports, using an "ultraconservative estimate," equated to $10,000 per class member. The courts took the estimated credit benefits of $10,000 per class member into account when it calculated the aggregate benefits conferred to the class. See, e.g., *Myers*, No. 15JE-AC05976-01 at 9 n. 1 ("Using an estimate of $ 10,000 in benefit conferred to each class member for deleting their tradeline from their credit reports, the Settlement Class also receives a benefit of approximately $77,010,000 ($10,000 per each of the 7,701 identified Class Members).")

*Id.,* fn. 2. A copy of the final approval order in *Jackson*, *supra*, and its referenced affidavit are attached as **Exhibit 7**. *See also, Cosgrove v. Citizens Auto Fin., Inc.,* 2011 WL 3740809, at *7 (E.D. Pa. Aug. 25, 2011) ("additional obligation to correct negative entries on class members' credit reports is tangible and adds value to the settlement").

[11] "There is a presumption of fairness when only a small fraction of the class objected." *In re Warfarin*, 391 F.3d at 535. *See also, In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 436 (3d Cir. 2016).

31

First, the requested attorneys' fees of $6,000,000.00 represents **approximately 7%** of the $81.95 million quantifiable portions of the settlement consideration, *not* including the tradeline deletion estimated value of between $15.25 million and $223.29 Million Dollars (i.e., solely the $15.25 million Settlement Fund plus the compromise of approximately $66.7 million in disputed Deficiency Balances – totaling approximately $81.95 Million Dollars). In valuing a settlement, courts routinely consider credits in addition to cash. S*ee, Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 147 (E.D. Pa. 2000) (including cash and student loan debt forgiveness in valuing common fund settlement for purposes of determining reasonable attorney's fees on a percentage of recovery method), citing to *Perod v. McKenzie Check Advance of Pennsylvania, LLC*., No. 98-CV-6787 (E.D. Pa. 2000)(valuing extinguishment of payday loan obligations as a component to determine attorney fee percentage in common fund settlement). *See also, Follansbee v. Discover Fin. Servs., Inc.*, No. 99 C 3827, 2000 WL 804690, at *2 (N.D. Ill., 2000) (valuing settlement to include debt forgiveness and account credits, and evaluating fee against that value). *See also In re Lloyd's Am. Trust Fund Litig.*, 2002 WL 31663577, at *26(S.D.N.Y., 2002) *aff'd sub nom*; *Adams v. Rose*, No. 03-7011, 2003 WL 21982207 (2d Cir., 2003) ("Because this case is a common fund case, I find that the percentage of-recovery method provides a more appropriate basis for evaluating counsel's fee petition."). *Cullen* at 147. The Third Circuit favors the percentage-of-recovery method for calculating attorney's fees. "[T]he percentage-of-recovery method is generally favored in cases involving a common fund." *Gelis v. BMW of N. Am., LLC*, 49 F.4th 371, 379 (3d Cir. 2022); *Also see*: *In re Cendant Corp.PRIDES Litig.*, 243 F.3d 722, 732 (3d Cir. 2001); *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 333–34 (3d Cir. 1998)("[t]he percentage-of-recovery method is generally favored in cases involving a common fund, and is designed to allow courts to award fees from the fund in a manner that rewards counsel

32

for success and penalizes it for failure." *Cullen v. Whitman Medical Corporation*, 197 F.R.D. 136, 147 (E.D. Pa. 2000). Significantly, the Settlement and proposed fee was negotiated at arm's-length by experienced and sophisticated counsel.

Wells Fargo does not object to Class Counsel's application for fees not to exceed Six Million ($6,000,000) Dollars plus reimbursement of costs not to exceed $100,000.00, which meets the Supreme Court's preference for consensual resolution of attorneys' fees as the ideal culmination of successful litigation. *See, Hensley v. Eckerhart*, 461 U.S. 424 (1983). A fee negotiated under these circumstances is entitled to substantial weight. *In re First Capital Holdings Corp. Fin. Prods. Sec. Litig.*, MDL No. 901, 1992 U.S. Dist. LEXIS 14337 at *13 (C.D. Cal. June 10, 1992); *In re M.D.C. Holdings Sec. Litig.*, [1990 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶95, 474 at 97, 487-88 (S.D. Cal. Aug. 30,1990)("[b]ecause this Court believes the parties should be encouraged to settle all their disputes as part of the settlement . . ., including the amount of the fee, it believes that if the agreed-to fee falls within a range of reasonableness, it should be approved as part of the negotiated settlement between plaintiffs and defendants."). Additional argument relating to this request for attorney fees is set forth below.

Second, the procedure for processing individual claims under the Settlement is fair and reasonable. Those Class Members who made payments towards their disputed Deficiency Balances after their vehicle was repossessed and sold will receive a Refund Payment of these deficiency payments, all Class Members will receive a Per Account Payment (which will be the same per Account), all Class Members will receive deletion of their credit tradelines and the likely credit repair (unless they elect not to receive this benefit), and all Class Members with Deficiency Balances will have those disputed Deficiency Balances compromised by accord and satisfaction.

33

An additional factor is a comparison between the results achieved by the settlement for individual Class Members and the results likely to be achieved for other claimants. Although the cash payment to the Class Members is less than the minimum statutory damages they could receive, this is more than offset by the facts that: (1) an individual claimant would not be certain of prevailing in an individual action; (2) may be subject to claims of setoff or recoupment by Wells Fargo for any Deficiency Balance the claimant purportedly owed (which would greatly reduce any recovery), while under the current proposed Settlement, Class Members will not have their recovery set-off by their purported Deficiency Balance, but are having those disputed Deficiency Balances fully compromised by way of an accord and satisfaction which should eliminate any potential tax burden; and, (3) unless all Class Members will also receive the benefit of Wells Fargo's request to be made to all the major credit bureaus for the deletion of their credit tradeline, which is an equitable remedy they would not be assured of receiving in an individual action.

**B.  The Settlement Class Should Be Certified.**

Plaintiffs' arguments for class certification were set forth in Plaintiffs' Memorandum of Law in Support of their Motion for Preliminary Settlement Approval, Certification of Settlement Class, and Approval of Class Settlement Notice. Due to the length, Plaintiffs will not repeat those arguments here, but will incorporate them by reference and believe that the facts and issues discussed herein demonstrate that the class certification requirements of Fed. R. Civ. P. Rule 23 have been clearly satisfied. The only new factor to be addressed is the response of the Class to the Class Notice which has been overwhelmingly favorable. As noted above, there were only three objections and one of those was withdrawn, and only 11 Class Members have opted out. This factor, of course, supports the grant of certification for purposes of implementing the instant Settlement.

Class Counsel highly recommends the approval of the Settlement by the Court and its acceptance by the Class Members. Plaintiffs' counsel has considerable experience engaging in this type of class litigation, has routinely certified other similar classes (as summarized below), and has evaluated the strengths and weaknesses of the claims and the concomitant terms of the settlement relative to other similar cases and enthusiastically endorses this settlement

### C. Class Counsel's Requested Fees are Reasonable and Should Be Approved and Class Counsel's expenses were Reasonable and Should be Reimbursed

#### 1. The Equitable Foundation for Award of Attorneys' Fees in Representative Actions

The United States Supreme Court has long held that one who successfully pursues a lawsuit that creates a common fund is entitled to reasonable compensation from the fund. *Trustees v. Greenough,* 105 U.S. 527 (1882). *See also, Boeing Co. v. Van Gemert,* 444 U.S. 472, 478 (1980). The Third Circuit favors the percentage-of-recovery method for calculating attorney's fees in common fund cases. It has explained that "[t]he percentage-of-recovery method is generally favored in common fund cases because it allows courts to award fees from the fund 'in a manner that rewards counsel for success and penalizes it for failure.'" *In re AT&T Corp.,* 455 F.3d 160, 164 (3d Cir. 2006); See also, *In re Rite Aid Corp. Sec. Litig.,* 396 F.3d 294, 300 (3d Cir. 2005); *In re Cendant Corp. Prides Litig.,* 243 F.3d 722, 734 (3d Cir. 2001); *Cullen v. Whitman Medical Corporation,* 197 F.R.D. 136, 147 (E.D. Pa. 2000); *In re Prudential Ins. Co. America Sales Litig.,* 148 F.3d 283, 312 (3d Cir. 1998). And courts have long recognized that the attorneys' contingent risk is an important factor in determining the fee award. *See Florin v. Nationsbank of Georgia, N.A.,* 34 F.3d 560, 565 (7th Cir. 1994); *Gaskill,* 160 F.3d at 363. The importance of contingent fee-based litigation is particularly evident in the context of consumer protection cases such as this one. The Courts have consistently recognized the value of private litigation as a necessary and

desirable tool to assure the effective enforcement of the consumer protection, securities, and antitrust laws. *See, e.g., Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 625 (1997); *In re Constar Int'l Inc. Sec. Litig.,* 585 F.3d 774, 781 (3d Cir. 2009); *See also Perry,* 229 F.R.D. at 123 (many consumer claims would be ignored but for the consumer class action.)

### 2.  The *Gunter* Factors

The Third Circuit set forth the factors for the district court's fee-award consideration, in *Gunter v. Ridgewood Energy Corp.,*223 F.3d 190, 195 (3d Cir. 2000) (overturning a decision that reduced to 18% a requested fee of 25% of the recovered fund). Notably, the *Gunter* factors "need not be applied in a formulaic way because each case is different, and in certain cases, one factor may outweigh the rest." *Wallace,* 2015 WL 9268445, *17. The *Gunter* factors include the size of the fund created and number of persons benefiting from the settlement; the presence/absence of substantial objections to the fee; the skill of plaintiffs' counsel; the complexity and duration of the litigation; the risk of nonpayment; the amount of time devoted to the litigation; and awards in similar cases. *Gunter,* 223 F.3d at 195. As described below, analysis of the *Gunter* factors supports the requested fee of $6 million, plus reimbursement of litigation expenses, to date, in the amount of $17,290.33.[12]

### (a)  The size and nature of the common fund created, and the number of persons benefited

As stated above, this settlement provides a cash payment of $15 million (which will increase by the time of distribution of the QSF to approximately $15.25 million due to investment, as explained above) and the compromise of approximately $66.7 million in Deficiency Balances for the class, plus valuable credit repair, for 22,329 Class Members. After the proposed attorneys'

---

[12] Though considerable, all expenses associated with Westlaw research will be absorbed as an overhead expense and not billed as a cost advanced.

fees of $6,000,000 and the estimated settlement administrator expenses of $210,000 are deducted from the $15.25 million QSF, approximately $9,040,000 will remain. Approximately $6.87 million will be distributed to eligible Class Members for Refund Payments, and the remaining $2,170,000 shall be distributed to Class Members on a per-account basis over the 22,329 Settlement Class Member accounts.

Thus, the benefits conferred entail, *inter alia*, approximately $97 to be paid on a per account basis, which will likely be increased by further distributions due to some Class Members not cashing their checks (see detailed explanation of multiple distributions above). If the Class Member who is only to be paid on a per account basis negotiates their settlement check in the first or second distribution, they will receive a share of the uncashed checks in the latter distribution which will include a share of the uncashed refund payment bucket of settlement funds.

In addition, Class Members will receive the benefits of the compromise of Class Members' Deficiency Balances; and full credit repair reparation. In short, Class Counsel highly endorse this settlement as these aggregate benefits are exceptional. Further, see the Declaration of Robert L. Rossi in Support of Request for an Award of Attorneys' Fees (**Exhibit 8**), stating that Class Counsel's requested fee is reasonable in light of the value of the Settlement and benefits to the Class. Also see the Declaration of Hon. Judge Diane M. Welsh (Ret.) of JAMS in Support of Proposed Class Settlement (**Exhibit 5**), ¶20, in which she states that Class Counsel's requested fee is "reasonable and supported on the complexity of this action, the substantial effort that Class Counsel skillfully expended over the course of the litigation and settlement process, and the very considerable benefits that Class Counsel was able to obtain for the Settlement Class."

**(b) The absence of large numbers of objections to the request for fees supports approval**

The second factor focuses on the reaction of the Class to the requested attorney fees. The "absence of large numbers of objections mitigates against reducing fee awards." *Perry*, 229 F.R.D. at 123-24; *In re Diet Drugs Prod. Liab. Litig.*, 553 F. Supp. 2d 442, 473 (E.D. Pa. 2008) (dearth of objections "signifies that the requested award has been viewed by interested parties to this action as fair"); See *also, In re Rite Aid*, 396 F.3d at 305 (affirming district court's finding that the filing of but two objections weighed in favor of awarding fee). The Class Notice stated that Class Counsel would apply for an award of fees out of the settlement proceeds of up to $6 million (See **Exhibit 3**). There were only three objections to this Settlement (one of which has been withdrawn), and Class Counsel respectfully asserts that the other two objections (interposed by Shawn Hummel and Jennifer Hummel) are baseless. See contemporaneously filed Response to Objection. Only eleven (11) Class Members have opted out involving seven (7) accounts.

**(c) The Skill and Efficiency of Class Counsel**

The "single clearest factor reflecting the quality of Class Counsels' services to the Class are the results obtained." *In re Flonase Antitrust Litig.*, 291 F.R.D. 93, 104 (E.D. Pa. 2013). The skill and efficiency of Plaintiffs' counsel is "measured by the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel." *In re Ikon, supra, at* 194. The goal under our Circuit's precedent is to ensure "that competent counsel continue to undertake risky, complex and novel litigation" for the benefit of large numbers of Class Members who might otherwise lack reasonable access to justice. *Gunter, supra*, at 198.

38

Hon. Lawrence F. Stengel (Ret.), former Chief Judge for the United States District Court for the Eastern District of Pennsylvania, is a shareholder at Saxton & Stump and focuses his practice on internal investigations, arbitrations and mediations, monitorships and receiverships. Judge Stengel has decades of experience in multiple types of litigation. As Co-Chair of the firm's Investigations and Criminal Defense practice, he leads a team of attorneys who conduct fair and thorough internal investigations for corporations, educational institutions, governmental agencies, municipalities and other organizations across the country. Recent notable matters include:

- Special Investigator in the National Football League's (NFL) Concussion Settlement program;
- Chair of the Independent Oversight Committee for the Archdiocese of Philadelphia's Independent Reconciliation and Reparations Program (IRRP); and,
- Special Master in complex civil cases in the United States District Court for the Eastern District of Pennsylvania and for the District of Delaware.

Attorney Shenkan regularly engages in consumer class litigation and other complex litigation similar to the present case and has dedicated substantial resources thereto, serving as class counsel in numerous certified consumer post-repossession disclosure notice class actions, including: *Kelly v. Santander Consumer USA, Inc.*, E.D. Pa. Case No. 2:20-cv-03698; *Flynn, et. al., v Manufacturers and Traders Trust Company a/k/a M&T Bank*, E.D. Pa. Case No. 2:17-cv-04806-WB, *Langer, et al., v. Capital One Auto Finance*, E.D. Pa. Case No. 2:16-cv-06130-HB, *Maszgay, et al., v. First Commonwealth Bank*, Jefferson County Case No. 686-2015, *Hughes v. Nationwide*, Lawrence County Case No. 10557-2020, *Cruz v. Citadel*, Philadelphia County Case No. 200501167, *Cooley, et al. v. FNB, et al.,* Lawrence County Case No. 10010-2003, *Antonik, et al v. First National Community Bank, et al.*, Lackawanna County Case No. 2013-cv-4438, *Ryan, et. al., v. Tidewater, Philadelphia County Case No.* 170903529, *Dudo, et* al., v. *Capital One Auto*

39

*Finance,* Jefferson County Case No. 296-2020. He has also served as class counsel in several TCPA class actions, including: *Mauthe v. ITG,* E.D. Pa. Case No. 5:18-cv-01968; *Mauthe v. Spreemo,* E.D. Pa. Case No. 18-cv-1902, *Mauthe v. Versa Cardio, LLC.,* E.D. Pa. Case No. 5:16-cv-00570-JLS, *Conner v. Optum360, LLC.,* E.D. Pa. Case No. 2:17-cv-01642, and *Conner v. Carepoint Medical Solutions, LLC.,* W.D. Pa. Case No. 2:16-cv-01436-NBF.

In *Hughes v. Nationwide Trust Company, FSB, formerly known as Nationwide Bank,* 10557-2020 (Lawrence County, CCP. March 8, 2022), the Court recognized that Mr. Shenkan for litigating and certifying the first post-repossession disclosure case in Pennsylvania stating:

> Indeed, *Cooley, supra.,* a class action litigated for years in this Court before a certified settlement, paved the way for the legal concepts that have been replicated in Pennsylvania thereafter in a variety of similar UCC defective post-repossession consumer disclosure notice cases. … Here, Mr. Shenkan pursued this complicated claim with persistency and skill, and in a zealous manner for his clients. His extra efforts to pursue discovery and revise pleadings are recognized by this Court as laudable.

*Hughes, supra.,* Preliminary Approval Order, p. 7-8.

In the final approval order dated October 1, 2020 in *Ryan v. Tidewater Finance Company,* No. 20092996 (Sept. Term 2017) the Court commented:

> Class Counsel Richard Shenkan, Esquire has demonstrated distinguished legal ability. He is committed to an orderly and responsible administration of the Settlement Agreement.

In *Maszgay, supra.* President Judge John Foradora described Mr. Shenkan's qualifications as follows:

> Plaintiffs' counsel, Richard Shenkan, is a well-qualified litigator with over 20 years of experience and has served as class counsel in other consumer class cases throughout Pennsylvania." *Maszgay, supra,* slip op. at 7. The Jefferson County Court further stated: "This case presented novel, complex issues and Class Counsel effectuated an excellent recovery for the Class through his perseverance and skill.

Class Counsel's experience and skill are also evident in the very effective and efficient prosecution of the claims, including the substantial settlement, against well-matched, well-financed opponents. *See In re Ikon Office Solutions, Inc., Sec. Litig.,* 194 F.R.D. 166, 194 (E.D. Pa. 2000) (recognizing as a "significant factor" the "quality of representation").

In the present case, Class Counsel negotiated a significant settlement for the Class, with many moving and complicated parts, including tax issues relating to the full compromise of the approximately $64.39 million in disputed Deficiency Balances via an accord and satisfaction. Class Counsel has obtained very substantial and definite monetary benefits for 22,329 Class Members (Pennsylvania consumers) in a judicially efficient and highly practical manner despite Wells Fargo's significant defenses. In the absence of this litigation, most of the Class Members would have lacked any reasonable access to legal representation to pursue their relatively modest statutory claims under the UCC, or the wherewithal to defend potential deficiency actions and the negative attendant credit damages resultant thereto. Moreover, Class Counsel effectuated this tremendous relief despite the widespread arbitration provisions and class action waivers which, if litigated further, might have substantially caused the considerable reduction in the class size and recovery.

### (d) The complexity and duration of the litigation

Complexity and duration of the litigation is another factor the Court considers in analyzing Class Counsel fees. *See In re General Motors,* 55 F.3d at 821. By almost any standard, this was very complex litigation. Because this was a class action, it necessarily involved an additional array of substantive and procedural issues related to class certification as an overlay to the underlying substantive legal issues. This matter involved difficult issues of statutory interpretation dealing with the interaction of the Pennsylvania Uniform Commercial Code and the Motor Vehicle Sales

41

Finance Act. Further complicating this case were the potential income tax issues relating to any settlement or award received by Plaintiffs and Class Members.

The effort to forge a settlement that combined a substantial cash recovery with a full compromise of disputed debts and 100% credit report reparation was not simple and, in some ways, added a complexity for an otherwise "litigation only" defense approach. It is also noteworthy that final approval does not end the complexities (or work) to be faced by Class Counsel. Class Counsel will undoubtedly deal with future communications from Class Members related to the settlement, possibly for such things as non-receipt of checks, credit report tradelines not deleted, the satisfaction or expungement of judgments, and other anticipated similar wind-down matters.

### (e) The risk of nonpayment

Class Counsel undertook this action on an entirely contingent fee basis, assuming a substantial risk that counsel would have to devote a significant amount of time and incur expenses in prosecuting this action without any assurance of being compensated for the efforts or reimbursed for the costs incurred. Indeed, Class Counsel has not been compensated for any of the time or efforts since this matter was filed, while expending over $17,290.33 in costs for expert fees, filing fees, mediation fees, air travel, lodging, and the like. As recognized by this Court, where class counsel incurs thousands of dollars in costs and expenses while facing the risk of not being reimbursed [,] "[t]he risk of nonpayment...weighs in favor of granting the requested fee award." *Wallace*, 2015 WL 9268445 at *19. The Courts in this Circuit take into account that counsel prosecuted the case on a contingent fee basis. This risk is a significant factor to be considered in determining the fee, as these hours were expended without any guarantee of success. *O'Rourke v. Healthdyne, Inc.* 1986 WL 923, at *2 (E.D. Pa. Jan. 16, 1986). This factor certainly favors the requested attorney fee.

While Plaintiffs remain confident in the strength of their case, and of their ability to prove

damages, this action (and indeed all litigation) involves substantial risks and the ultimate outcome cannot be predicted with certainty, particularly in a case such as this, which was novel in many ways. Accordingly, the risk of non-payment in this case weigh in favor of approving the fees sought in this Motion.

### (f)  Awards in other class actions

The attorney fees requested represent a little more than the 33 and 1/3%, that is commonly discussed by Courts, of the cash that will be in the settlement fund at the time of distribution (here approximately 39%). However, these requested fees represent approximately only 7% of the quantifiable portions of the settlement consideration – i.e., the $15 million cash payment plus approximately $250,000.00 in interest, plus the compromise of approximately $66.7 million in disputed Deficiency Balances (totaling $81.95 million in benefit conferred, <u>not including</u> the potential value of credit repair to the Class Members). If the value of credit repair is considered, the attorney fees requested represent approximately 6% of the total benefit conferred if such credit repair is valued at $15.25 million (equal to the cash component of the settlement consideration pursuant to *Ciccarone v. B.J. Marchese, Inc.,* supra) and approximately 2% of the total benefit conferred if such credit repair is valued at $223.29 million ($10,000 per class member pursuant to *Jackson v. Missouri Credit Union, supra.*).

Attorneys' fees of 30-40% of the benefit obtained on behalf of the class is within the approved range in class actions. *Gaskill v. Gordon*, 160 F.3d 361 (7th Cir. 1998) (awarding 38% of the common fund as fees); *Taubenfeld v. Aon Corp.*, 415 F.3d 597 (7th Cir. 2005) (approving award of fees equal to 30% of $7.25 million settlement plus $111,054.06 in expenses and citing with approval a submission showing thirteen cases with awards of 30-39% in common fund cases); *Grier v. Chase Manhattan Automotive Finance Co.*, 2000 2000 WL 175126 (E.D. Pa.) (awarding

43

fees of 33 and 1/3% of settlement fund, noting that because common fund is relatively small, it is appropriate to award a higher percentage than in cases resulting in substantially larger funds); *In Re Greenwich Pharm. Sec. Lit.*, 1995 WL 251293 (E.D. Pa. 1995) (approving fee of 33% as appropriate in settlement of $4.375 million, noting that in smaller cases a fee award of 33% does not present the danger of providing plaintiff's counsel with the windfall that would accompany a mega-fund of, for example, $100 million.).

### 3. Plaintiff's requested fee is an appropriate percentage of the recovery and the request for reimbursement of costs is reasonable

Plaintiffs submit that the most suitable analysis of the reasonableness of their requested attorney fee does not focus on only the cash portion of the benefit provided to the class by the Settlement, but on the totality of the wide-scoped benefits. In valuing a settlement, courts routinely consider credits in addition to cash. S*ee Cullen, supra.,* at 147 (including cash and student loan debt compromise in valuing common fund settlement for purposes of determining reasonable attorney's fees on a percentage of recovery method); *Perod v. McKenzie Check Advance of Pennsylvania, LLC.*, No. 98-CV-6787 (E.D. Pa. 2000) (valuing compromise of payday loan obligations as a component to determine attorney fee percentage in common fund settlement). *Follansbee v. Discover Fin. Servs., Inc.*, 2000 WL 804690, at *2 (N.D. Ill., 2000) (valuing settlement to include debt compromise and account credits, and evaluating fee against that value); *In re Lloyd's Am. Trust Fund Litig.*, 2002 WL 31663577, at *26 (S.D.N.Y., 2002) ("Because this case is a common fund case, I find that the percentage of-recovery method provides a more appropriate basis for evaluating counsel's fee petition."). *Cullen,* at 147. In *Cullen,* the United States District Court for the Eastern District of Pennsylvania explained: "The settlement fund in this case involves cash and forgiveness of debt. There is no question that the $5.97 million in cash is appropriately considered in determining the value of the settlement. The relevant issue is the

appropriate value of the $1.3 million in loan forgiveness." *Id.* Having thus framed the issue, the court concluded:

> Debt forgiveness for students who are already delinquent in paying back their loans arguably does not have the same value as cash in hand. In addition to the debt forgiveness, however, students credit reports will be cleared of this default. Moreover, the fee sought by class counsel is based solely upon the cash and debt forgiveness and does not include the non-monetary benefits to the class. The non-monetary relief includes appointment of an ombudsman by the court and other remedial measures to provide future students with a better educational experience at UTS. <u>Therefore, I find it reasonable to include debt forgiveness in the total settlement value.</u>

*Id*. <u>Emphasis</u> added.

Furthermore, the fee agreement between counsel and each of the Representative Plaintiffs provides for a fee equal to 40% of the total benefit conferred upon the class.[13] Plaintiffs believe that the request for an award of fees to Class Counsel in the sum of $6 million to be paid to Class Counsel is fair and reasonable in light of all the relevant factors to be considered.

Class Counsel's expenses total $17,290.33 to date, which is reasonable for such a complex litigation, for which reimbursement is respectfully requested. Additional expenses are anticipated and will be submitted to the Court for approval.

### V. CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that this Court enter an Order, giving final approval to the Settlement Agreement, certifying the Settlement Class, awarding Plaintiffs the requested attorney fees and approving the reimbursement of counsel's expenses, approving the requested service awards to the Representative Plaintiffs, entering a final judgment, and dismissing this case with prejudice subject only to administrative matters.[14]

---

[13] *See, Edwards v. Alaska Pulp Corp.,* 920 P.2d 751, 758 footnote 15 (Alaska 1996) (courts may consider, but should not be bound by the percentage in a contingency fee arrangement).

[14] Class Counsel will be prepared to provide any supplemental information this Court requires to determine

Respectfully submitted,
SHENKAN INJURY LAWYERS, LLC.
*/s/ Richard Shenkan*

| | |
|---|---|
| Richard Shenkan | Hon. Lawrence F. Stengel (Ret.) |
| Shenkan Injury Lawyers, LLC. | Saxton & Stump, P.C. |
| 6550 Lakeshore St. | 280 Granite Run Dr., Suite 300 |
| West Bloomfield, MI 48323 | Lancaster, PA 17601 |
| P: (248) 562-1320 | P: (717) 556-1000 |
| rshenkan@shenkanlaw.com | lfs@saxtonstump.com |

*Co-Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was sent to all counsel of record on the date of filing via the Court's electronic court filing system (ECF).

SHENKAN INJURY LAWYERS, LLC.
*/s/ Richard Shenkan*
Richard Shenkan
*Co-Counsel for Plaintiffs*

---

the reasonableness of any aspect of this Settlement, including an affidavit supporting time devoted to case and an itemization of expenses incurred to date.