## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

VINCENT SORACE, JOSEPH YERTY,
TAMMY YERTY, JAMES ZARONSKY,
LINDA ZARONSKY, VIKTOR
STEVENSON, ASHLEY YATES, and
KIMBERLY SOLOMON-ROBINSON,
individually and on behalf of a class of
similarly situated persons,

        *Plaintiffs,*

   v.

WELLS FARGO BANK, N.A.

        *Defendant.*

CIVIL ACTION
NO. 20–4318

---

**Pappert, J.**                                                     **February 15, 2024**

### MEMORANDUM

The parties have agreed to settle this class action after more than three years of litigation.  The Court preliminarily approved the settlement on September 15, 2023. (ECF No. 85.)  Plaintiffs now move for final approval of the Settlement Agreement, plan of allocation, award for attorneys' fees, expenses, and awards to the representative Plaintiffs.  (ECF No. 101).  Of the over 22,000 class members only two, Shawn Hummel and his wife Jennifer, object to the settlement.  After reviewing all relevant submissions and holding a hearing (ECF No. 107), the Court overrules the Hummels' objections and grants the Motion.

I

Named Plaintiffs, individually and on behalf of others similarly situated, sued Wells Fargo, alleging violations of Pennsylvania law for using deficient disclosure notices and practices when it repossessed Plaintiffs' vehicles.  After Plaintiffs filed their

Second Amended Complaint and Wells Fargo moved to dismiss it, the parties jointly requested a stay so that they could pursue settlement negotiations.  (ECF No. 48).  After eighteen months of negotiations, including two in-person mediations before retired United States Magistrate Judge Diane Welsh, *see* (Decl. of Hon. Diane M. Welsh (Ret.), ECF No. 101–6), Plaintiffs filed a Motion for Preliminary Approval of Settlement, with a proposed settlement class consisting of persons who, in relevant part, entered "a retail installment sales contract in Pennsylvania for the financing of a motor vehicle purchased primarily for personal, family or household use and whose retail installment sales contract was assigned or sold to Wells Fargo."  (pp. 14–15, ECF No. 74-1).

Under the Settlement Agreement, Wells Fargo agrees to pay $15 million into a settlement fund, which will be used to: (1) make refund payments, totaling approximately $6.87 million, to those class members whose vehicles were repossessed and sold and who subsequently made payments toward their disputed deficiency balances; (2) pay out distributions on a per account basis to the 22,340 class members, who hold 17,235 unique loans; (3) pay incentive awards to the class representatives; (4) pay settlement administrative costs; and (5) pay attorneys' fees and expenses.  (Mem. Supp. Mot. for Final Approval, pp. 10–11, ECF No. 101–1.)

In addition to contributing to the settlement fund, Wells Fargo will stop collecting on the deficiency balances alleged to be owed by each class member—a value of approximately $65 million.[1]  (*Id.* at pp. 22–23).  Wells Fargo will also submit requests

---

[1]    The parties' briefing provides different values when describing the amount of debt forgiveness—ranging from about $65 to $68 million—since loan balances fluctuated slightly over the course of litigation.  For the purposes of considering the adequacy and reasonableness of the Settlement Agreement, the Court will use the more conservative $65 million estimate.

to the three major credit reporting agencies to delete the credit tradelines associated with each class member's account. (*Id.* at p. 24)  In exchange, Wells Fargo will be released from all claims arising from each class member's "auto loan account(s) owned by Wells Fargo Auto related to the financing of his/her/their vehicle(s), which were subsequently repossessed" and are the subject of this action.  (Settlement Agreement, ¶ 1.2, ECF No. 74-2)

## II

Pursuant to Federal Rule of Civil Procedure 23(e), class actions may only be settled with court approval and only after a hearing that finds the settlement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  The Court must: (1) determine if the requirements for class certification under Rule 23(a) and (b) are satisfied; (2) assess whether notice to the proposed class was adequate; and (3) evaluate if the proposed settlement is fair under Rule 23(e).  *See In re Nat'l Football League Players Concussion Inj. Litig.*, 775 F.3d 570, 581 (3d Cir. 2014).

## III

The settlement class must meet Rule 23(a)'s requirements:  numerosity, commonality, typicality, and adequacy of representation.  Fed. R. Civ. P. 23(a).  These requirements ensure that the named plaintiffs appropriately represent the class and "effectively limit[s] the class claims to those fairly encompassed by the named plaintiff's claims."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011) (citations and quotations omitted).

Because the numerosity requirement is generally met if the potential number of plaintiffs exceeds forty, *Stewart v. Abraham*, 275 F.3d 220, 226–27 (3d Cir. 2001), a

class with more than 22,000 members is sufficiently numerous as to make joinder impractical under Rule 23(a).

The commonality bar "is not a high one." *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3d Cir. 2013). A single common issue is enough to satisfy the commonality requirement. *See Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994). Typicality requires the Court to assess "whether the action can be efficiently maintained as a class and whether the Named Plaintiffs have incentives that align with those of absent class members so as to assure that the absentee's interests will be fairly represented." *Id.* at 57. Here, both the commonality and typicality requirements are met. The issues of law and fact in this case are common to all class members. For example, the question of whether Wells Fargo sent inadequate notices of vehicle repossession and explanations of post-sale deficiencies is common to all class members. *See* (Mem. in Supp. of Mot. for Final Approval, p. 16). Additionally, Named Plaintiffs' claims are typical of those of all class members: Named Plaintiffs—like all members of the class—entered into retail installment sales contracts assigned or sold to Wells Fargo, and Wells Fargo repossessed their vehicles or ordered them to be repossessed after deeming their respective contracts in default. (*Id.*)

The final factor—whether "the representative parties will fairly and adequately protect the interests of the class"—is also met. Fed. R. Civ. P. 23(a)(4). The Named Plaintiffs' interests align with those of other class members. And class counsel— former Chief United States District Judge for the Eastern District of Pennsylvania, Lawrence Stengel, and Richard Shenkan, an attorney specializing in class actions involving consumer disclosure notices—are qualified and capable of litigating the

4

class's claims.  *See* (Mem. in Supp. of Mot. for Final Approval, p. 47).  The representative Plaintiffs and class counsel have protected the interests of the class, as reflected by the substantial settlement.

The settlement class also "must satisfy at least one of the three requirements listed in Rule 23(b)."  *Wal-Mart*, 564 U.S. at 345.  Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 594 (1997).  The predominance inquiry focuses on whether the defendants' conduct was common to all class members and whether that conduct harmed everyone in the class.  *In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 249, 263 (E.D. Pa. 2012) (citing *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 297 (3d Cir. 2011).  It "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem,* 521 U.S. at 623.  The predominance requirement is met since there are issues of law and fact common to all class members regarding Wells Fargo's consumer disclosure notices.

Superiority requires the Court to "balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication."  *In re Warfarin*, 391 F.3d at 534 (citations omitted).  Rule 23(b)(3) directs the Court to consider the following factors:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and

> nature of any litigation concerning the controversy already commenced by or against members of the class; [and] (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum . . . .[2]

Fed. R. Civ. P. 23(b)(3).  All these factors are satisfied as nothing about this litigation indicates individual control is a more favorable vehicle for bringing these claims against Wells Fargo.  A class action is therefore superior to other methods of adjudication.

Because all relevant Rule 23(a) and (b) factors are met, the settlement class is certified for purposes of settlement approval.

## IV

Before turning to the merits of the Settlement Agreement, the Court must next determine that notice was appropriate.  *In re Am. Invs. Life Ins. Co.*, 263 F.R.D. 226, 237 (E.D. Pa. Dec. 18, 2009) (citations omitted).  For all classes certified under Rule 23(b)(3), the Court must direct notice to the class members in the best way practicable under the circumstances.  Fed. R. Civ. P. 23(c)(2)(B).

> The notice must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

*Id.*

The notice meets all the requirements of Rule 23.  It includes information regarding the litigation, the definition of the class and the claims and issues in the litigation, and the claims that will be released in the settlement.  *See* (Notice of

---

[2]      In the class action settlement context, the Court "need not inquire whether the case, if tried, would present intractable management problems, . . . for the proposal is that there be no trial."  *Amchem*, 521 U.S. at 620.

Proposed Class Action Settlement, ¶¶ 1–7, 13, ECF No. 101–4).  The notice also: advises that a class member may enter an appearance to attend the final fairness hearing (*Id.* at ¶¶ 27–29); describes the binding effect of a judgment on class members (*Id.* at ¶ 20); states the procedures and deadline for class members to exclude themselves from the class or to object (*Id.* at ¶¶ 19–20); and provides the date, time and location of the final settlement hearing (*Id.* at ¶ 27).

The notice also complies with the Court's Preliminary Approval Order and satisfies the requirements of Rule 23.  Wells Fargo provided to the Settlement Administrator, Rust Consulting, information including the last known address, telephone number and email address of each class member.  *See* (Mem. Supp. Mot. for Final Approval, pp. 16–17).  Beginning on November 14, 2023, Rust began mailing class notices to 23,943 class members or their next of kin, *see* (Declaration of Settlement Administrator ¶ 12, ECF No. 101–3).  After 1,846 class notices were returned as undeliverable, Rust conducted three tracing activities yielding 353 new addresses to which class notice was sent.  (*Id.* at ¶ 14).  Rust also sent email notices to 13,887 class members or their next of kin.  (*Id.* at ¶ 15). Additionally, notice was posted on the website https://www.vehiclerepolawsuit.com.  This notice was adequate and the best practicable under the circumstances.

## V

The Court must determine that the proposed settlement is "fair, reasonable and adequate."  *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 282, 316 (3d Cir. 1998) (quoting *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995)); *see also* Fed. R. Civ. P. 23(e).  In the Third

7

Circuit, there is an initial presumption of fairness if "(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *In re Warfarin*, 391 F.3d at 535 (quoting *In re Cendant Corp. Litig.,* 264 F.3d 201, 232 n. 18 (3d Cir. 1998)).  Each of these factors is met: negotiations occurred at arm's length, including via Judge Welsh; the case was litigated for over three years; informal discovery and factual investigation took place over sixteen months before settlement discussions began; Plaintiffs' counsel has well-documented experience handling class actions generally and consumer-disclosure notice actions specifically; and only three class members objected to the settlement (two of whom are husband and wife and the third withdrew her objection).  Therefore, there is an initial presumption of fairness applied to this settlement.

With this initial presumption established, Rule 23(e)(2) and the *Girsh* factors guide the Court's in-depth fairness analysis.  *See Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975).

## A

Rule 23(e)(2) directs the Court to consider whether:

> (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account:  (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).  Rule 23(e) protects the unnamed members of the class.

8

*Ehrheart v. Verizon Wireless*, 609 F.3d 590, 593 (3d Cir. 2010); *see also In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 349 (3d Cir. 2010) ("Under Rule 23(e), trial judges bear the important responsibility of protecting absent class members, which is executed by the court's assuring that the settlement represents adequate compensation for the release of the class claims.").

1

Class counsel and the Named Plaintiffs adequately represented the class. Fed. R. Civ. P. 23(e)(2)(A). Counsel was able to "develop enough information about the [litigation] to appreciate sufficiently the value of the claims." *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 439 (3d Cir. 2016). Counsel has vigorously pursued this case on behalf of class members from the start. They investigated and litigated the case for sixteen months—filing two amended complaints and responding to a motion to dismiss—before beginning settlement discussions with Wells Fargo. *See* (Mot. for Final Approval of Settlement, p. 25; Am. Compl., ECF No. 24; Sec. Am. Compl., ECF No. 36).

2

The parties negotiated the settlement at arm's length. Fed. R. Civ. P. 23(e)(2)(B). Two mediations were held with Judge Welsh. The first was on January 26, 2022, (Feb. 2, 2022 Joint Status Report, ECF No. 50), and the second on April 19, 2022. (May 3, 2022 Joint Status Report, ECF No. 53). Following the two mediations, "hundreds of hours" of discussions, and "dozens of drafts with various iterations of settlement terms," the parties came to an agreement. (Mem. in Supp. of Mot. for Preliminary Approval, p. 14). *See In re Wawa Inc. Data Sec. Litig*, 85 F.4th 712, 726

9

(3d Cir. 2023) (holding that the presence of an independent mediator is "a factor weighing in favor of a finding of non-collusiveness," but "is not on its own dispositive of whether the end product is a fair, adequate, and reasonable settlement agreement." (quoting *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 948 (9th Cir. 2011))). And the parties' clear sailing provision, addressed in more detail below, does not indicate collusion.  *See infra* subsection VII.B.4.

3

The relief the settlement is expected to provide class members is adequate when balanced against "(i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)."  Fed. R. Civ. P. 23(e)(2)(C)(i)–(iv).

i

Continuing this litigation would cause the parties to incur substantial additional costs and necessitate extensive trial preparation.  In addition to the inherent risk to recovery involved in prolonged litigation, continuing through trial and subsequent appeals would only delay any recovery class members may receive.  Plaintiffs maintain that their request for deletion of credit tradelines is permitted under the UCC's equity provision, 13 Pa. C.S. § 1103(b), but also acknowledge the UCC does not specifically refer to credit-tradeline relief, nor has such relief "been the subject of any decisional appellate authority in Pennsylvania or the Third Circuit," rendering further uncertainty and risk in proceeding to trial.  (Mem. in Supp. of Mot. for Final Approval,

10

p. 35).  *See also* (Mem. in Supp. of Mot. for Preliminary Approval, p. 28).   The parties carefully weighed the relevant costs, risks and delays when reaching this settlement.

ii

The proposed method of distributing relief to the class is effective.  The notice complies with Rule 23 and adequately informed class members that: (1) a refund payment would be sent if they made any payments on their accounts following repossession and subsequent sale of their respective motor vehicles, (2) a cash payment will be sent to all class members on a per account basis, and (3) they should cash their respective checks immediately.  *See* (Notice of Proposed Class Action Settlement, p. 7, ECF No. 101-4).  Furthermore, Wells Fargo's agreement to no longer pursue the settlement class members' deficiency balances—providing approximately $65 million in debt relief—will occur without class members taking any additional steps.  (*Id.* at pp. 7–8).  Upon final approval, Wells Fargo will also ask Experian, Equifax, and TransUnion to delete their credit reporting tradelines related to the class members' accounts, while excluding any class members who submitted written requests to refuse the tradeline deletion benefit.  (*Id.* at p. 8).

iii

The relief to the class remains adequate when considering the proposed award of attorneys' fees.  Fed. R. Civ. P. 23(e)(2)(C)(iii).  As evaluated in more detail below, an attorneys' fee award of $6 million is reasonable evaluated against a settlement with a monetary value above $80 million—$15 million in cash along with more than $65 million in debt relief—and not including the benefits of credit tradeline reparations. *See infra* Part VIII.

11

iv

Finally, Rule 23(e)(2)(iv) requires the Court to account for any agreements between the parties required to be identified under Rule 23(e)(3), meaning "any agreement made in connection with the proposal." The Settlement Agreement sets forth the relevant agreements, including that Defendants will not oppose class counsel's request for attorneys' fees. (Settlement Agreement ¶ 15.5). The Court's close look at this agreement in the context of the larger settlement raise no concerns. This Settlement Agreement is the product of more than three years of contested litigation and two mediations before Judge Welsh, who attests that attorneys' fees were never a negotiating tool during settlement discussions. (Decl. of Hon. Diane Welsh, p. 6); *See also infra* subsection VII.B.4.

4

The final element of Rule 23(e)(2) requires the Court to determine whether the proposal treats the class members equitably relative to each other. Fed. R. Civ. P. 23(e)(2)(D). Refund payments will be sent to any class members who made payments on their accounts following repossession and subsequent sale of their respective motor vehicles. (Mem. in Supp. of Mot. for Final Approval, p.10). All class members will then receive a portion of the settlement fund on a per account basis. (*Id.*) The settlement therefore treats class members equitably relative to each other because each member's recovery is proportional to his or her actual loss suffered.

B

Courts within the Third Circuit also "employ a more expansive fairness inquiry" by applying the nine *Girsh* factors. *In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*, No.

17-341, 2022 WL 16533571, at *4 (E.D. Pa. Oct. 28, 2022); *see Girsh*, 521 F.2d at 157.

These factors are:

> (1) the complexity, expense and likely duration of the litigation;
> (2) the reaction of the class to the settlement;
> (3) the stage of the proceedings and the amount of discovery completed;
> (4) the risks of establishing liability;
> (5) the risks of establishing damages;
> (6) the risks of maintaining the class action through the trial;
> (7) the ability of the defendants to withstand a greater judgment;
> (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and]
> (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Girsh*, 521 F.2d at 157. The Court addresses each factor in turn.

## 1

This contested litigation—approximately sixteen months of motions practice followed by another eighteen months of settlement negotiations—required complex and skillful work on the part of both parties. Should it continue, the parties would incur additional expenses. Plaintiffs' counsel have incurred expenses of over $24,000. (Costs Advanced by Shenkan Injury Lawyers, ECF No. 113–7). Should the case go to trial, Plaintiffs will have to obtain class certification and maintain the class through trial. The settlement allows class members to receive their payments quickly; further litigation would delay any potential recovery while the parties continue to incur additional expenses.

## 2

The second *Girsh* factor "attempts to gauge whether members of the class support the settlement." *In re Prudential,* 148 F.3d at 318. In *Prudential*, the Third Circuit held that the district court did not abuse it discretion in finding that 19,000 opt

13

outs—out of 8 million policyholders to whom Prudential sent the class notice—was "truly insignificant."  148 F.3d at 318.

Here, after more than 23,000 notices were sent out, only eleven class members opted out. (Mem. in Supp. of Mot. for Final Approval, p. 33).  Additionally, three class members objected, one of whom withdrew her objection.  (*Id*.); *see also* discussion *nfra* Section VII.  The class supports the settlement, indicative of its fairness.

3

The third factor to consider is the stage of the proceedings and the amount of discovery completed.  Courts are instructed to examine the amount of discovery undertaken to "ensure that a proposed settlement is the product of informed negotiations."  *In re Prudential,* 148 F.3d at 319.  "As with the presumption of fairness, formal discovery is not a requirement for the third *Girsh* factor.  What matters is not the amount or type of discovery class counsel pursued, but whether they had developed enough information about the case to appreciate sufficiently the value of the claims." *In re NFL Players Concussion Injury Litig.*, 821 F.3d 410, 439 (3d Cir. 2016).

Here, the parties completed informal discovery over sixteen months.  Class counsel filed two amended complaints before the parties began settlement negotiations, at which point the parties "received further information regarding the class."  (Mem. in Supp. of Mot. for Preliminary Approval, p. 29)  Both parties had a clear sense of the strengths and weaknesses of their respective cases, which cuts in favor of approving the settlement.

4

*Girsh* factors four and five "survey the possible risks of litigation in order to

14

balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement." *In re Prudential*, 148 F.3d at 319. Plaintiffs acknowledge they would face the uncertainty of proving each element of their case, all of which Wells Fargo aggressively contests. (Mem. in Supp. of Mot. for Final Approval, pp. 34–35). Specifically, they note that neither the Third Circuit Court of Appeals nor Pennsylvania appellate courts have considered whether the equitable remedies Plaintiffs seek—including the deletion of credit tradelines—are available under the UCC. (*Id.*) The uncertainty of moving forward with litigation weighs in favor of approving the settlement.

5

The next *Girsh* factor considers the risks of maintaining the class certification through trial. Because there is always a "possibility of decertification, and consequently the court can always claim this factor weighs in favor of settlement," this factor merits slight weight. *In re Prudential*, 148 F.3d at 321 (explaining how "examination of this factor in the standard class action would appear to be perfunctory" due to the inherent risk of decertification); *see also In re Cendant*, 264 F.3d at 239 (acknowledging that "proceeding to trial would always entail the risk, even if slight, of decertification."). Nevertheless, this factor favors approval.

6

The seventh *Girsh* factor "is concerned with whether the defendants could withstand a judgment for an amount significantly greater than the Settlement." *In re Cendant*, 264 F.3d at 240. Wells Fargo contributed $15 million in cash to the settlement fund and, through accord and satisfaction, agreed to forgive class members'

15

disputed loan debts—an estimated $65 million value.  The Court must consider whether Wells Fargo could withstand a judgment significantly greater than this amount.  *In re Cendant*, 264 F.3d at 241.  "A defendants' speculative ability to pay 'substantially more than they did under the Settlement' cut[s] against approval, 'albeit only moderately.'"  *Sullivan v. DB Invs., Inc.,* 667 F.3d 273, 323 (3d Cir. 2011) (quoting *In re Cendant*, 264 F.3d at 241).  But "in any class action against a large corporation, the defendant entity is likely to be able to withstand a more substantial judgment, and, against the weight of the remaining factors, this fact alone does not undermine the reasonableness of the instant settlement."  *Sullivan v. DB Invs., Inc.,* 667 F.3d 273, 323 (3d Cir. 2011) (quoting *Weber v. Gov't Empl. Ins. Co.*, 262 F.R.D. 431, 447 (D.N.J. 2009)).

## 7

The eighth and ninth *Girsh* factors help determine whether the settlement is reasonable in light of the best possible recovery and the risk of further litigation.  They "evaluate whether the settlement represents a good value for a weak case or a poor value for a strong case."  *In re Warfarin*, 391 F.3d at 538.  Courts are instructed to compare the damages plaintiffs would likely recover if successful—discounted for the risk of not prevailing—with the amount of the settlement agreement.  *In re Prudential*, 148 F.3d at 322.  The inability to determine the precise amount of damages Plaintiffs would likely recover if successful at trial does not render the Court unable to conduct this analysis.  *See In re N.J. Tax Sales Certificates Antitrust Litig.*, No. 12-1893, 2016 WL 5844319, at *8 (D.N.J. Oct. 3, 2016).

Wells Fargo's $15 million contribution to the settlement fund, along with the

approximately $65 million in debt relief for class members, provide good value to the

class.  And although the benefit deriving from the deletion of credit tradelines is

difficult to quantify, it has been conservatively valued at the cash component of the

settlement—in this case, $15 million.  *See Ciccarone v. B.J. Marchese, Inc.*, 2004 WL

2966932, *10 (E.D. Pa., Dec. 22, 2004); *see also* (Decl. of Robert L. Rossi, p. 6, ECF No.

101–9); (Decl. of Thomas A. Tarter, pp. 6–9, ECF No. 101–7).  Furthermore, Wells

Fargo has found their requests to credit agencies for deletions of credit tradelines to be

"very effective."  (Hr'g Tr. 16:19).  And Wells Fargo has "built in backstops in the event

that the first ask is not effective so that [they] can ask again."  (*Id.* at 16:20–21).  But

even excluding any benefit conferred by the deletion of credit tradeline history, the

settlement provides good value.  Considering Wells Fargo's continued challenges to

Plaintiffs' case and taking "seriously the litigation risks inherent in pressing forward

with the case," this settlement is reasonable.  *In re Nat'l Football League*, 821 F.3d at

440.

## VI

A class action's distribution plan must be fair, reasonable and adequate as

well.  *In re Ikon Off. Sols., Inc., Sec. Litig.*, 194 F.R.D. 166, 184 (E.D. Pa. 2000) (citing

*In re Computron Software, Inc.*, 6 F. Supp. 2d 313, 321 (D.N.J. 1998)).  Courts

"generally consider plans of allocation that reimburse class members based on the type

and extent of their injuries to be reasonable." *Sullivan*, 667 F.3d at 328 (quoting *In re*

*Corel Corp. Inc., Sec. Litig.,* 293 F.Supp.2d 484, 493 (E.D. Pa. 2003)).

Here, refund payments will be sent to any class members who made payments

on their accounts following repossession and subsequent sale of their respective motor

vehicles.  (Mem. in Supp. of Mot. for Final Approval, p.10).  All class members will receive a portion of the settlement fund on a per account basis, and those class members who cash their respective checks will be sent up to three additional checks so long as $15,000 remains in the settlement fund after each round of distribution.  (*Id.* at pp. 10, 20–21).  The parties have proposed that any funds remaining after four distributions will be donated to the Pennsylvania Legal Aid Network.  (*Id.* at p. 22). This distribution is fair, reasonable and adequate.

VII

There were two objections raised to the proposed settlement.  Celeste Brooks-Wade withdrew hers, *see* (ECF No. 90), leaving only Jennifer Lynn Hummel and Shawn David Hummel's jointly-filed objection.[3]

A

The Hummels and their Pittsburgh-based bankruptcy lawyer, Aurelius Robleto, have taken a curious approach to this case.  Counsel also represents the Hummels in bankruptcy proceedings in the Western District of Pennsylvania, which is how he learned about this litigation.  *See* (Hr'g Tr. 42:1–23).  On September 7, 2023, counsel, on behalf of the Hummels and two others—who are not even class members and could not show significant interest in the litigation—filed in this case a motion to intervene. (ECF No. 79).  The Court denied the motion because it failed to demonstrate how, absent intervention, the "proposed intervenors' rights would be impaired, or their

---

[3]     The Hummels filed a response in opposition to Brooks-Wade's withdrawal of her objection speciously claiming, *inter alia*, her signature appeared to have been "drafted exclusively" by class counsel—presumably implying the withdrawal was not voluntary.  (ECF No. 103).  In a supplemental filing, Brooks-Wade attests that she had withdrawn her objection because she "would like the settlement to be approved," and had reviewed and approved the notice of withdrawal that class counsel had drafted.  (ECF No. 106).

interests inadequately represented." (Mem. Denying Mot. to Intervene, p. 2, ECF No. 83). The Court also explained that "[a]ny substantive challenges" the Hummels have "can be addressed as objections to the settlement," or they are "free to opt out of the class settlement." (*Id.* at p. 5).

Eight days later, the Court preliminarily approved the Settlement Agreement. (ECF No. 85). The Order stated, in relevant part, that "all Class Members who do not timely and validly exclude themselves from the Settlement Class . . . are barred from directly or indirectly maintaining, commencing, prosecuting, or pursuing directly, representatively, or in any other capacity, any Released Claim subsumed and covered by the Release in the Agreement." (Prelim. Approval Order ¶ 25, ECF No. 85).

Rather than opt out of the Settlement Agreement, the Hummels chose to remain part of this class while also filing a separate putative class-action lawsuit in the United States District Court for the Western District of Pennsylvania pertaining to their same Wells Fargo accounts at issue in this case. [4] *Hummel v. Wells Fargo Bank, N.A.*, No. 2:23-cv-02002-CCW (W.D. Pa. 2023). At this case's final approval hearing, counsel told the Court that while he read the Preliminary Approval Order, he was unaware of the provision barring him from pursuing any claims covered by the release in the Settlement Agreement. (Hr'g Tr. 58:13–25). Counsel's statement was not credible and, among other things, taints the Hummels' objections. And when explaining why he both objected and filed a separate class-action asserting related claims—counsel said the

---

[4] After the Hummels filed suit in the Western District, Wells Fargo filed a motion asking this Court enforce its Preliminary Approval Order which ostensibly bars class members who did not opt out from litigating the released claims. (ECF No. 97; *see also* (Prelim. Approval Order ¶ 25, ECF No. 85). For the reasons explained at the final approval hearing, *see* (Hr'g Tr. 95–96), the Court denies Wells Fargo's motion without prejudice. Counsel's conduct in the Western District of Pennsylvania is for that court to evaluate, at least initially.

19

quiet part out loud: he believes the class members "should be joining in our class action." (Hr'g Tr. 55:17–18).

B

The Hummels assert: (1) the release is overbroad; (2) the forgiveness of deficiency balances on class member accounts is an "illusory" benefit and raises tax issues for class members; (3) the settlement fund is insufficient; and (4) the Court should look askance at the attorneys' fees. (ECF No. 88). None of their arguments have any merit.

1

The Hummels argue that the release language is overbroad because it includes, *inter alia*, the release of "unknown" claims and "distinct" claims from those negotiated in the settlement. *See* (Mem. in Supp. of Objection to Final Approval, p. 11, ECF No. 88–1). But it is "not unusual for a class settlement to release all claims arising out of a transaction or occurrence" including unknown claims. *Halley v. Honeywell, Int'l, Inc.*, 861 F.3d 481, 494 (3d Cir. 2017). Furthermore, the scope of the released unknown claims is limited to those that would arise from the auto-financing accounts at issue in this settlement. *See* (Settlement Agreement, ¶ 1.51).

The Hummels also argue the release should include carve-out language so they can "'preserve the Hummel claims' for both the Hummels and all members of the class." (Hr'g Tr. 72:25 –73:1). The Hummels purportedly have distinct claims "as articulated in" the case in the Western District of Pennsylvania "based on Wells Fargo improperly charging [them] a fee using the wrong date." (Hr'g Tr. 73:25; 74:24). Counsel wants the Hummels and all class members he can solicit to "benefit from whatever [*sic*] out of

20

this" Settlement Agreement while also stirring up another class action in a different district over the same alleged conduct. (*Id.* at 44:12–13). That is not how class actions work—class members may either remain in a class or opt out and do their own thing, not both.

2

The Hummels describe the debt forgiveness as "terrific" and acknowledge it "will give benefit to a lot of people," *see* (Hr'g Tr. 89:2–9), yet simultaneously claim the benefit is "illusory," take issue with its possible tax benefits for Wells Fargo and predict difficulties for class members that are at best speculative and at worst nonsensical. (Mem. in Supp. of Objection to Final Approval, p. 15).

First, they argue that since the proposed settlement involves repossessions that occurred between 2014 and 2023, and in Pennsylvania the statute of limitations bars legal recourse for deficiency claims after four years, a significant portion of the nine-year settlement period involves claims that would not be collectible. (*Id.*) They apparently fear a scenario where class members will be subject to collection efforts from collectors who will not tell them that some of the claims which are the subject of these efforts are time-barred.

First of all, the debt forgiveness would confer a significant monetary benefit approximating the amount of the loans. Courts frequently include debt forgiveness in the value of settlements. *See Cosgrove v. Citizens Auto. Fin., Inc.*, No. 09-1095, 2011 U.S. Dist. LEXIS 95656 (E.D. Pa. Aug. 25, 2011) (holding that "debt forgiveness provides a valuable award to class members" and forgiveness need not be considered a "nonmonetary award . . . that 'deserve[s] careful scrutiny to ensure that it ha[s] actual

21

value to the class.") (citing Fed. R. Civ. P. 23, Advisory Committee's Note)); *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 147 (E.D. Pa. 2000) (holding that the proposed student loan forgiveness might not "have the same value as cash in hand" but was of value given student credit reports would be cleared of default). Second, since Wells Fargo does not sell its debts, there will be no future "dunning calls" or other collection pursuits from third parties—regardless of whether or not the statute of limitations has run. *See* (Hr'g Tr. 23:6–8); *see also* (Decl. of Thomas A. Tarter, p. 10).

The Hummels also purport to be concerned with Wells Fargo's issuance of 1099(c) forms to class members, which are tied to the forgiveness of deficiency balances. The Hummels cite the Third Circuit Court of Appeals' decision, *Zarin v. Commissioner*, for the proposition that the forgiveness of disputed loan deficiencies should not be treated as income for tax purposes. 916 F.2d 110, 115 (3d Cir. 1990). They then speculate that Wells Fargo's issuance of a 1099(c) form could trigger the IRS to recompute class members' taxes and treat the forgiven indebtedness as taxable income, creating a discrepancy with how class members filed their taxes. (Hr'g Tr. 80:2–10). Then, according to counsel, class members will have an "illegal burden foisted upon them that's improper and illegal under *Zarin*." (Hr'g Tr. 84:4–5).

These concerns are as inherently contradictory and vacuous as they sound. Again, the tax issues which may arise from the issuance of a 1099(c) are purely speculative. And for Wells Fargo's part, it believes the IRS requires issuance of the 1099(c), something discussed at length during the settlement negotiations. *See* (Hr'g Tr. 100:2–20). The Hummels fail to demonstrate why the issuance of a 1099(c) makes the Settlement Agreement unfair or unreasonable.

The Hummels also believe there could be possible tax benefits for Wells Fargo for writing off the debt. (Mem. in Supp. of Mot. to Object to Final Approval, pp. 17–18). They claim "Wells Fargo will or may have already taken write downs for this $65 million" which is "going to be considerably more than the $15 million being contributed to this settlement." (Hr'g Tr. 83:12–14). But they offer no evidence that either (a) Wells Fargo will derive tax benefits to begin with or (b) that those tax benefits will exceed the benefits conferred to class members. Furthermore, the Court is tasked with considering the benefit to the class, not conjectural benefits to Wells Fargo.

3

Third, the Hummels argue the settlement fund is insufficient, and calculate that class members will receive less than $30 per account while assuming, incorrectly, that administrative costs will be $2.5 million. (Mem. in Supp. of Objection to Final Approval, p. 19). However, the parties project the payment per account will be about $97 while the administrative costs are around $200,000. *See* (Wells Fargo's Resp. to Hummels' Objection to Mot. for Final Approval, p. 10, ECF No. 98). And even at the $200,000 number, the costs will not diminish class member's recovery. Following the Court's Preliminary Approval Order, Wells Fargo deposited the $15 million cash payment into an interest-bearing account, generating approximately $250,000; this interest alone is enough to cover the estimated administrative costs. *See* (Hr'g Tr. 7:8–24). What's more, the Hummels' objection takes a myopic view of the Settlement Agreement's benefits and fails to account for value conferred by debt forgiveness and deletion of credit tradelines.

4

Fourth, the Hummels argue that the attorneys' fee award should be closely scrutinized, claiming the fees are "excessive" and (again, with no basis) implying "collusion" between the parties since Wells Fargo did not challenge the fee amount. (Mem. in Supp. of Objection to Final Approval, pp. 21–23).[5]

Nothing supports the Hummels' bomb throwing.  Courts should look closely at any side agreements[6] such as "clear sailing clauses, which amount to 'agreement[s] by a settling party not to oppose a fee application up to a certain amount.'"  *In re Wawa*, 85 F.4th 712, 724 (3d Cir. 2023) (quoting Fed. R. Civ. P. 23 Advisory Committee's Note to 2003 Amendment); *see also In re NFL Players Concussion Injury Litig.*, 821 F.3d at 447 ("We join our sister circuits in declining to hold that clear sailing provisions are *per se* bars to settlement approval while nonetheless emphasizing that they deserve careful scrutiny in any class action settlement.")

The Settlement Agreement includes language that Wells Fargo "will not oppose class counsel's request for the Incentive Payment provided it is consistent with this Agreement."  (Settlement Agreement ¶ 15.5).  But Judge Welsh emphasized that the amount of attorneys' fees "was never used as a bargaining chip" in negotiations.  (Decl. of Hon. Diane Welsh, p. 6).  And contrary to the Hummels' characterization of the settlement process, the protracted litigation—and the proposed Settlement Agreement's

---

[5]      The Court will address the purported "excessiveness" of attorneys' fees in Part VIII, *infra*.

[6]      The term "side agreements" is described under the Federal Rules of Civil Procedure's advisory committee notes as agreements negotiated between class counsel and others that though "seemingly separate . . . may have influenced the terms of the settlement by trading away possible advantages for the class in return for advantages for others." *See also* 7B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1797.5 (3d ed. updated 2023).

benefits to class members—is indicative of zealous advocacy on behalf of class members and an arms'-length deal absent collusion. *See Kao v. CardConnect Corp.*, 2021 WL 698173, at *7 (E.D. Pa. Feb. 23, 2020); *Compare In re Wawa*, 85 F.4th 712 (vacating and remanding attorneys' fee award as part of a settlement agreement that included, *inter alia*, $9 million in gift cards to class members (of which $2.9 million was claimed) and a "reverter" such that that any court-ordered reduction in the attorneys' fees would be returned to the defendant, not the class).

VIII

Plaintiffs seek an attorneys' fee award of $6 million. "In a certified class action, the court may award reasonable attorney[s'] fees . . . that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). Two calculation methods may be used to determine whether a requested fee award is reasonable: the lodestar and the percentage-of-recovery methods. *See In re Gen. Motors*, 55 F.3d at 820-21. The lodestar method "uses the number of hours reasonably expended" to determine "an adequate fee irrespective of the monetary value of the final relief achieved for the class." *Id.* at 821. The percentage-of-recovery method "calculates the percentage of the total recovery that the proposal would allocate to attorneys' fees by dividing the amount of the requested fee by the total amount paid out by the defendant[.]" *In re Cendant*, 264 F.3d at 256. The percentage-of-recovery method is appropriate where, as here, the value of the settlement to the class can be readily calculated. *See, e.g.*, *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005). Furthermore, the percentage-of-recovery method is generally favored in cases with a common fund because courts can award fees from the fund in a way that "rewards counsel for success and penalizes it for failure."

25

*In re Prudential,* 148 F.3d at 333 (internal quotations omitted.)

A

In the Third Circuit, "thorough judicial review of fee applications is required in all class action settlements." *In re Gen. Motors*, 55 F.3d at 819. Courts apply the *Gunter* factors to determine if the fee produced is reasonable. *See Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190, 195 n.1 (3d Cir. 2000). Those factors include:

> (1) the amount of the value created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiff's counsel; (7) the awards in similar cases[.]

*In re Diet Drugs Prod. Liab. Litig.,* 582 F.3d 524, 541 (3d Cir. 2009). These factors "need not be applied in a formulaic way . . . and in certain cases, one factor may outweigh the rest." *Id.*

First, the amount of value created and number of persons benefitted favors approval of this award. The settlement includes a $15 million settlement fund which, after all expenses are deducted from the fund, is projected to result in a distribution of just under $100 per class member. Courts have also found it appropriate to value debt forgiveness for the purposes of determining the reasonableness of attorneys' fees. *Cullen*, 197 F.R.D. 136 at 147; *Follansbee v. Discover Fin. Servs., Inc.*, No. 99 C 3827, 2000 WL 804690, at *2 (N.D. Ill., 2000) (including debt forgiveness in the settlement's value and evaluating attorneys' fees against that value); *see also* (Dec. of Robert L. Rossi, p. 6). Here those loans are valued at $65 million. Excluding any benefits that class members would receive from the deletion of their credit tradelines—a benefit that

26

class counsel admits would be a difficult to quantify for each class member, *see* (Hr'g Tr. 35:3–14)—still results in a settlement value of approximately $80 million and militates toward approval.

Second, the amount of fees sought was clearly outlined in the notice for any class member to object and there was only one objection to the fee award—that jointly filed by the Hummels and their bankruptcy lawyer.  The Hummels characterize the attorneys' fees as "excessive," asserting the $6 million to be 40 percent of a $15 million settlement.  (Mem. in Supp. of Objection to Final Approval, p. 17).  They fail to account for the benefits of debt forgiveness conferred on class members, which are quantifiable. This factor favors approval.

Third, the skill and efficiency of class counsel warrants approval of the award. As discussed above, Plaintiffs' counsel competently litigated this case for more than three years.  Former Chief Judge of the Eastern District of Pennsylvania, Lawrence Stengel, has decades of experience in complex litigation.  *See* (Mem. in Supp. of Mot. for Final Approval, p. 47).  Richard Shenkan's experience in class actions involving consumer repossession and disclosure notices has been well documented, too.  (*Id.*) This factor favors approval of the requested award.

Fourth, the case's complexity and duration supports approval of the award.  The initial complaint was filed in July 2020.  (ECF No. 1.)  After Wells Fargo removed the case in September 2020, class counsel filed a first Amended Complaint (ECF No. 24), a second Amended Complaint (ECF No. 36), defended a Motion to Dismiss (ECF No. 40), completed informal discovery, and subsequently negotiated the settlement, including

through two mediations.  With efforts spanning almost three years, counsel's requested fees are justified.

Fifth, counsel litigated this case on a contingency fee basis, risking nonpayment absent a settlement or favorable judgment at trial.  *See O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266, 309 (E.D. Pa. 2003) ("Any contingency fee [arrangement] includes a risk of no payment.").  Success was not guaranteed in this case, and the risk undertaken by counsel merits approval of the requested fees.

Sixth, class counsel spent more than 2,840 hours on the case, conducting all the work outlined above and incurring litigation expenses of over $24,000.  (Costs Advanced by Shenkan Injury Lawyers, ECF No. 113–7).  The amount of time worked favors approval.

Seventh, counsel's request is well within the norm for awards in common fund cases.  In common fund cases, fee awards generally range from 19% to 45% of the settlement fund.  *See In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768 (3d Cir. 1995); *see also Galt v. Eagleville Hosp.*, 310 F. Supp. 3d 483, 498 (E.D. Pa. 2018) ("fee awards ranging from 30% to 43% have been awarded in cases with funds ranging from $400,000 to $6.5 million").  The attorneys' fees award is 40% of the $15 million cash settlement fund.  But, again, courts have included the value of debt forgiveness when valuing a common fund settlement.  *See, e.g. Cullen*, 197 F.R.D. 136; *see also* (Decl. of Robert L. Rossi, p. 6).  A $6 million attorneys' fee award, when cast against a settlement valued at $80 million, favors approval.

B

The Third Circuit has "suggested that district courts cross-check the percentage

28

award at which they arrive against the 'lodestar' award method." *Gunter*, 223 F.3d at

195 n.1.  But a lodestar cross-check is "not necessarily determinative." *In re Baby*

*Prods. Antitrust Litig.,* 708 F.3d 163, 179-80 (3d Cir. 2013); *see also Moore v. GMAC*

*Mortg.,* No. 07-4296, 2014 WL 12538188, at *2 (E.D. Pa. Sept. 19, 2014) ("The lodestar

cross-check is 'suggested,' but not mandatory.").

Courts calculate the lodestar award "by multiplying the number of hours

reasonably worked on a client's case by a reasonable hourly billing rate for such

services based on the given geographical area, the nature of the services provided, and

the experience of the attorneys." *Chakejian v. Equifax Info. Servs., LLC*, 275 F.R.D.

201, 216 (E.D. Pa. 2011) (internal quotation marks omitted).  Courts "should apply

blended billing rates that approximate the fee structure of all the attorneys who worked

on the matter" and "may rely on summaries submitted by the attorneys and need not

review actual billing records." *In re Rite Aid*, 396 F.3d at 306.  "The lodestar cross-

check calculation need entail neither mathematical precision nor bean-counting." *Id.*

(footnote omitted).

Class counsel applied the billing rates provided by the Community Legal

Services of Philadelphia attorney fee schedule to calculate the lodestar for each of the

attorneys who worked on the case.  *See* (Suppl. Brief in Supp. of Mot. for Final

Approval, pp. 5–7; 27–28, ECF No. 114).[7]  Counsel spent more than 2,840 hours on this

---

[7]     Richard Shenkan, Christopher Hogg and Jenna Townsend provided summaries of their hours worked on the case and their respective hourly billing rates, and the Court also performed an *in camera* review of their time records and an independent lodestar cross-check analysis.  Shenkan billed 1,350 hours at $850 per hour; Hogg billed 1,182.7 hours at $595 per hour; and Townsend billed 304.2 hours at $495 per hour.  Former Chief Judge Stengel also provided a declaration that he billed $800 per hour, indicating he spent more than six hours on the case.  *See* (Decl. of Lawrence F. Stengel, ECF No. 110–1); *see also* (Suppl. Brief in Supp. of Mot. for Final Approval, p. 5).

matter, with a blended billing rate (based on number of hours worked by attorneys at their respective hourly rates) of approximately $706 per hour, totaling a lodestar amount of approximately $2 million.[8]  This results in a lodestar multiplier of three, well within the range of reasonableness recognized by courts. *See* (*id*.)  The Third Circuit has recognized that multipliers "ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied."  *In re Prudential*, 148 F.3d at 341.  Given the facts of this case, a lodestar multiplier of three does not require the Court to reduce the requested fees.

Reimbursement from the fund for counsel's $24,689.33 in litigation expenses is also appropriate.  *See Lachance v. Harrington*, 965 F. Supp. 630, 651 (E.D. Pa. 1997) ("[A]n attorney who has created a common fund for the benefit of the class is entitled to reimbursement of his *reasonable* litigation expenses from that fund.").  Counsel has submitted a Declaration outlining the firm's expenses incurred during this litigation. (ECF No. 113–7).  The expenses incurred were necessary for the effective handling of this matter, and counsel is entitled to their attorneys' fees and expenses, plus interest at the same rate and for the same period as earned by the Settlement Fund.

## IX

Finally, the eight Named Plaintiffs each seek an award of $10,000.  Courts regularly "approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action

---

[8]     The Court's total lodestar calculation of approximately $2 million differs slightly from the $2.09 million calculation that class counsel provided.  *See* (Suppl. Brief in Supp. of Mot. for Final Approval, p. 6).  This discrepancy in total lodestar amounts derives from differences calculating the amount Shenkan billed.  But either calculation of the total lodestar establishes a reasonable multiplier—the Court's calculation creates a multiplier of three, compared to class counsel's calculation which creates a multiplier of 2.9.

litigation." *McDonough v. Toys R Us, Inc.*, 80 F. Supp. 3d 626, 665 (E.D. Pa. 2015) (citations and internal quotations omitted).  Courts need not employ factors to determine the amount of the class representative awards, as it does when awarding attorneys' fees.  *See In re Innocoll*, 2022 WL 16533571, at *12.  Here, Named Plaintiffs took substantial efforts on behalf of the class and engaged in more than three years of litigation before reaching the Settlement Agreement.  *See* (Supp. Brief in Supp. of Incentive Awards, ECF No. 116).  Their requests are reasonable given the time spent on this case and success obtaining a class settlement.

An appropriate Order follows.

BY THE COURT:

**/s/ Gerald J. Pappert**
Gerald J. Pappert, J.